## UNITED STATES DISTRICT COURT
## NORHERN DISTRICT OF ILLINOIS
## (EASTERN DIVISION)

| | |
|---|---|
| RIZWAN BHAILA, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>WALGREENS BOOTS ALLIANCE, INC., TIMOTHY C. WENTWORTH, MANMOHAN MAHAJAN, and RICK GATES<br><br>                    Defendants. | Case No. 24-cv-05907<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Rizwan Bhaila ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Walgreens Boots Alliance, Inc.. ("Walgreens" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Walgreens' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Walgreens securities between October 12, 2023 to June 26, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Walgreens' expected revenue for the fiscal year 2024. Defendants' statements included, among other things, confidence in the Company's pharmacy division brand inflation, volume growth, cost execution, discipline, and overall contribution to the Company.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Walgreens' pharmacy division; notably, that it was not truly equipped to handle the ongoing challenges in its industry and that Walgreens would require significant restructuring to create a sustainable model. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Walgreens' securities at artificially inflated prices.

4.      On June 27, 2024, Walgreens announced its financial results for the third quarter of fiscal 2024 and reduced its revenue guidance for the fourth quarter and full fiscal year 2024. The Company attributed its results and lowered guidance on the "significant challenges in the U.S. Retail Pharmacy business stemming from a worse-than-expected consumer environment and challenging pharmacy industry trends." Investors and analysts reacted immediately to Walgreens' revelation. The price of Walgreens' common stock declined dramatically. From a closing market

price of $15.66 per share on June 26, 2024, Walgreens' stock price fell to $12.19 per share on June 27, 2024, a decline of about 22.16% in the span of just a single day.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Walgreens is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

10.     Plaintiff purchased Walgreens common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Walgreens is attached hereto.

11.     Walgreens Boots Alliance, Inc. is an Illinois corporation with its principal executive offices located at 108 Wilmot Road Map, Deerfield, IL 60015. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "WBA."

12.     Defendant Timothy C. Wentworth ("Wentworth") was, at all relevant times, the Chief Executive Officer and Director of Walgreens.

13.     Defendant Manmohan Mahajan ("Mahajan") was, at all relevant times, the Executive VP and Global Chief Financial Officer of Walgreens.

14.     Defendant Rick Gates ("Gates") was, at all relevant times, the Senior VP & Chief Pharmacy Officer of Walgreens

15.     Defendants Wentworth, Mahajan, and Gates are sometimes referred to herein as the "Individual Defendants." Walgreens together with the Individual Defendants are referred to herein as the "Defendants."

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Walgreens' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements

4

pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Walgreens is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Walgreens under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

19.    Walgreens is a global company that delivers retail and pharmacy, and healthcare services across the United States, Europe, and Latin America.  The Company also has a healthcare segment dedicated solely to the US.

20.    Walgreens splits itself into three segments: United States retail and pharmacy, international sales, and United States healthcare.

### *The Defendants Materially Misled Investors Concerning*

### *Walgreens' Revenue Outlook for Fiscal Year 2024*

#### *October 12, 2023*

21.    On October 12, 2023, Defendants issued a press release announcing fiscal 2024 guidance as follows:

> *Fiscal 2024 guidance*
> - Expecting fiscal 2024 adjusted EPS of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution
> - Expecting U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million

- Not providing guidance beyond fiscal 2024; continuing to evaluate macroeconomic trends and challenges, and expecting to provide long-term guidance, if any, in the future

22.    On an earnings call the same day Executive VP and Global CFO Manmohan

Mahajan detailed their growth expectations, pertinently discussing the retail pharmacy segment of

the Company as follows:

> [W]e expect U.S. retail pharmacy underlying adjusted operating income to be driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy
>
> . . .
>
> U.S. Retail Pharmacy segment sales are projected to be flat to up 2%. AOI will be negatively impacted by approximately 8 percentage points from the lower COVID-19 contributions and roughly 11 percentage points of lower sale and leaseback gains. Excluding these impacts, the underlying business is projected to drive 5% to 10% AOI growth.
>
> I will now take you through the key business drivers. First, we anticipate script volume growth driven by overall market growth. On reimbursement, we have roughly 75% of the contract signed for calendar year '24. We do expect reimbursement pressure to be less of a headwind in fiscal '24 than in fiscal '23.
>
> We're projecting approximately 5 million COVID vaccinations in 2024. Quarter-to-date, we're well on track and have already administered over 3 million COVID vaccinations. In retail, we expect margins to benefit from our category performance improvement program and a roughly 1 percentage point increase in own brand penetration.
>
> At the same time, *we're adopting a prudent approach*. We see a continuation of the challenging trends that impacted the second half of fiscal 2023. ***We're projecting flat comparable sales due to a milder cough, cold, and flu season year-on-year, lower COVID OTC test kit volume and continued consumer pressure***. We're also planning a higher level of shrink, which has been increasing in the last several months and continues to represent a serious systemic issue across the retail industry. Within SG&A, we expect to achieve over $1 billion of cost savings during fiscal 2024, as Ginger has already described.
>
> . . .
>
> ***Moving beyond the first quarter, we will see sequential improvement,*** and I will discuss the top 4 drivers.  First, we're executing a series of actions ***to lower our***

*cost base*. These will have limited impact on the first quarter, but ***will start to ramp in the second quarter***. There is adjusted EPS benefit of $0.50 to $0.60 in the balance of the year compared to the first quarter.

Second, in our U.S. Healthcare segment, we expect profitability to improve from optimizing the clinic footprint, growing patient panels and realigning costs. ***Third, we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs.*** Finally, seasonality plays a role in our business, benefiting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season.

(Emphasis added).

23.     During the question-and-answer portion of the call, the Individual Defendants elaborated further on the cost-cutting measures affecting the retail pharmacy segment:

<Q: Lisa Christine Gill – JPMorgan Chase & Co – Analyst> And then just as it ties into kind of what everybody is talking about on the retail side, right, and I know you've given some guidance there. But as we think about expectation of scripts coming down, I would think that maybe there's an opportunity for more scripts to be pulled through into Walgreens.

I understand respiratory, et cetera. But maybe if somebody can comment, Rick, if Rick is on the call, how do you think about that pull-through and opportunity on the scripts, excluding what we're seeing on the respiratory side?

I know that the talk was 75% of relationships are signed on reimbursement, but reimbursement is expected to be down. Like what are going to be some of the big drivers beyond the $1 billion of incremental cost saves that we can actually see drive the operating profit in your core pharmacy business?

<A: Rick Gates> Yes. Lisa, this is Rick. It's a great question. And I'll kind of give the building blocks to script growth that we're expecting this year. Obviously, ***we saw a weaker end of the fiscal year from market growth, specifically around cough, cold, flu, some of the respiratory and some of the Medicaid redetermination, which shows some lower utilization from consumers.***

So the primary driver of the market coming back in line with what the expectations are from IQVIA and others. And so that's really what we've seen as we started into the first quarter of the fiscal year, and market is going to be a big underpinning to what we do. But ***we continue to advance our adherence programs that are really driving incremental script growth,*** partnering with health plans and others to really drive better adherence.

And obviously, that does help on the script side.

***You're also going to see some access initiatives, especially going into calendar year '24, which should be some tailwinds for us***. I think some changing dynamics in the marketplace or having individuals choose more open access and things that should give us access differently than what we've seen in the past. And the last one would be that we're really focused on potential profile buys and opportunities given some of the changes in the marketplace.

So I think there's a bunch of drivers that really give us confidence that we have tailwinds behind us in the script [ realm ].

. . .

<Q: George Robert Hill - Deutsche Bank AG – Analyst> Yes. This is kind of a two-parted question that go together. I guess can you talk about -- if we think about the segments, how we should look at apportioning the $1 billion in cost savings and kind of the other side of that is the cut in CapEx seems pretty severe. It's taking $0.5 billion or so out on a sub-$2 billion number.

How should we think about from a segment perspective, kind of where the CapEx cuts are coming from? And kind of how they're being apportioned? And I don't know if you can kind of give any examples specifically of the bigger sources of cost-cutting savings or the bigger sources of CapEx savings?

<A: Manmohan Mahajan> Yes, sure. So let me start with the cost savings. We're expecting at least $1 billion of cost savings. And I think the way you need to think about this is majority of this is going to be coming from our U.S. retail pharmacy business.

And 3 or 4 components, let me just walk through them real quick. Ginger talked about we're looking at all costs related to headquarter support office, and we're going line by line. So that's one. We are closing unprofitable locations, and that's going to be accretive in the year.

We have optimized store hours in certain locations to match with where the local market already is. And I think the other big component of this is we've looked at all the project spend and all the projects that exist across the company. And I think the focus is there twofold. More importantly, it's how do we focus the organization on customer-focused initiatives so that we deliver more value. But then obviously, reducing the spend on the income statement. So that's on the cost side.

Look, on the CapEx side, I'd say if you look at the trend we've seen, you go back to maybe fiscal '22, I think we were at around $1.4 billion in the year. We increased to -- this is '21, sorry. And then we went up $300 million. And again, last year was

the peak of $2.1 billion. And so what we're trying to achieve here is getting back to kind of the normal levels of CapEx here. Two parts that are going to contribute into this again is, one, as John talked about, we're very focused in our Healthcare segment on profitable growth. And so we will see a lower level of CapEx or growth CapEx coming out from U.S. Healthcare segment.

And then if you look at a couple of drivers of the CapEx on the U.S. retail pharmacy, micro fulfillment centers as well as our digital transformation, some of those things are coming to fruition. And Ginger talked about taking a pause on micro fulfillment center so that we increase the productivity and achieve the desired results there first. So those are some of the factors, high level that are driving the CapEx reduction.

(Emphasis added).

*January 4, 2024*

24.     On January 4, 2024, the company reported Q1 results as follows:

*First quarter and recent financial highlights*
- First quarter loss per share was $0.08 compared to a loss per share of $4.31 in the year-ago quarter; first quarter results included $278 million after-tax charge for fair value adjustments on variable prepaid forward derivatives related to the monetization of Cencora shares
- Adjusted earnings per share (EPS) decreased 43.1 percent to $0.66, down 43.7 percent on a constant currency basis reflecting challenging retail market trends in the U.S. and a 21 percentage point headwind from a higher tax rate
- First quarter sales increased 10.0 percent year-over-year to $36.7 billion, up 8.7 percent on a constant currency basis
- Announcing a 48 percent reduction in quarterly dividend payment to $0.25 per share

*Fiscal 2024 guidance*
- Maintaining fiscal 2024 adjusted EPS guidance of $3.20 to $3.50, with underlying earnings growth more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution
- Maintaining U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) million to $50 million

25.     During the same-day earnings call, CEO Wentworth detailed updates on the performance of the Company, stating, in pertinent part:

As you are by now aware, WBA started fiscal 2024 with on-plan results despite a weak retail environment in the U.S. First quarter adjusted EPS came in at $0.66, **reflecting execution and cost discipline in U.S. Retail Pharmacy**, continued strong

performance in International and progress with profitability initiatives in U.S. Healthcare. ***We are maintaining full year adjusted EPS guidance against a challenging backdrop. I must give credit here to the hard work and dedication of our teams. We are navigating the accumulating consumer pressures from inflation and depleted savings and somewhat slower-than-anticipated market trends in pharmacy script volumes, including impacts from a weaker respiratory season and Medicaid redetermination***.

Retail customers in the United States are under stress and making deliberate choices to seek value, evidenced in our own brands up 90 basis points in the quarter, while demand for seasonal and discretionary categories remains weak.

***At the same time, our teams executed well during the quarter on delivering pharmacy services, including vaccines and maintaining our overall share of script volume in the U.S.*** International was once again a bright spot in the quarter, building on last year's solid growth. Upside was led by Boots U.K. with further share gains in retail, while both retail and pharmacy delivered gross profit improvement despite inflationary cost pressures. Germany also achieved share gains.

. . .

So macroeconomic conditions are clearly difficult for retailers, and ***I fully acknowledge the structural headwinds in our core pharmacy business*** and the growing pains in our Healthcare segment. None of this is a surprise to me. I came to WBA eyes wide open with a clear mandate to act with everything on the table in terms of putting our business on the right track.

In that context, we are taking swift actions to rightsize costs and increase cash flow across the company. We remain on pace toward $1 billion in cost savings this year. Our U.S. organizational efforts have resulted in a planned headquarter support office workforce reduction of approximately 20%. Over the past 2 months, we have prioritized projects and capital spend to focus on the customer-facing activities that matter most.

. . .

We are enabling pharmacists to spend less time on tasks and more time on meaningful interactions and providing essential care, from health screenings to immunizations to diagnostic testing and treatment. Our network of micro fulfillment centers is helping to stabilize staffing and pharmacy hours, reduce workflow pain points and free up capacity to drive the outcomes that matter most to our patients and partners.

You'll remember in October we mentioned a pause in the rollout to optimize productivity. We are happy with our continued progress and the importance of these

centers in our overall strategy. We are also piloting virtual pharmacy to redefine connected care, further increase patient access, enhance workplace flexibility, and extend our pharmacist reach.

Finally, we are partnering with academia, and specifically, key schools of pharmacy to explore ways to attract, recruit and create a dynamic workplace for the next generation of pharmacists. Our relationships with pharmacy deans are integral to our strategy and can help us advance the profession, and so we are forming an advisory council to guide us in our transformation. I look forward to personally working with the deans with our first meeting in March to ensure Walgreens is the preferred employer in the pharmacy space. And I want to thank our pharmacy teams for their tireless efforts on the front lines of health care delivery in this country.

(Emphasis added).

26.     Senior VP and Interim Global CFO Mahajan went on to detail pharmacy's improvement, pertinently noting:

AOI declined 37.2% year-on-year, mainly driven by lower retail sales volume and margin, including higher levels of shrink. AOI was positively impacted by execution in our pharmacy services and progress on cost savings initiatives.

Let me now turn to U.S. Pharmacy. Pharmacy comp sales increased 13.1%, mainly driven by brand inflation and higher contribution from pharmacy services. COVID-19 vaccines have now shifted to a commercial model consistent with other vaccinations. Comp scripts grew 1.8%, excluding immunizations, in line with the overall prescription market.

. . .

Turning next to our U.S. Retail business. Challenging macroeconomic conditions and an anticipated slow start to the cough, cold, flu season contributed to a weaker retail performance year-on-year. Comparable sales declined 5% in the quarter.

There are 3 main drivers. First, a weaker respiratory season had an impact of approximately 160 basis points through the health and wellness category. Cough, cold, flu serves as a primary trip driver. As a result, we also experienced lower attachment sales due to the weaker season, which are incremental to the 160 basis points impact. Second, customers continue to pull back on discretionary spending, and actively seek out promotional opportunities. As a result, we saw an approximately 90 basis points impact from weaker holiday seasonal sales. Lastly, our decision to close most of our stores on Thanksgiving this year to further support our store team members led to a headwind of about 60 basis points.

While these factors resulted in lower sales across all categories, we experienced more pronounced declines in consumables and general merchandise and in health and wellness.

Retail gross margin was negatively impacted by 110 basis points due to higher shrink. Retail shrink continues to be a systemic issue across the retail industry.

27.     Turning to future projections, Defendant Mahajan provided the following outlook

for the remainder of fiscal year 2024:

I will now turn to guidance. We are maintaining our fiscal '24 adjusted EPS guidance. We expect certain incremental tailwinds and headwinds in a challenging environment compared to our prior outlook.

***On the tailwinds, with strong execution to date, we now expect pharmacy services to deliver ahead of our initial plan.*** We also anticipate an improvement in our full year adjusted effective tax rate as a result of tax planning initiatives, with a revised range of 15% to 17%, compared to the prior outlook of 19% to 20%.

On the headwinds. ***First, we expect the pullback in consumer spending and shifting behaviors will continue to impact our retail sales in the U.S. in the short term, while improving in the second half***. We now expect retail comp sales for fiscal '24 to decline low single digits compared to the prior outlook of flat. Second, we expect approximately $125 million in reduced sale and leaseback gains versus our prior outlook. As we explained in October, this is the last year of anticipated sale leaseback transactions. ***Lastly, we also forecast slightly lower overall market volume growth for prescriptions compared to our previous expectations.***

. . .

Looking ahead to the second half of fiscal '24, there are 4 key drivers for our improving earnings profile. First, as we have previously discussed, we expect actions to lower our cost base will continue to ramp over the year. Second, we expect U.S. Healthcare segment profitability will scale over the balance of the year, mainly driven by benefits from optimizing the clinic footprint, growing patient panels and realigning cost at VillageMD, and growth across all of the businesses.

***Third, we cautiously expect modest level of retail market growth against an easier second half comparison.*** Finally, our tax rate was elevated in the first quarter. We expect favorability in the remainder of the year.

(Emphasis added).

12

*March 28, 2024*

28.     On March 28, 2024, Walgreens issued its press release reporting second quarter results, including a 3.4 percent increase in adjusted EPS and a 6.3% increase in sales year over year. Turning to future guidance, the Company announced it was slightly altering its guidance:

> Narrowing fiscal 2024 adjusted EPS guidance to $3.20 to $3.35, reflecting challenging retail environment in the U.S., early wind-down of sale-leaseback program, and lower earnings due to Cencora share sales, offset by execution in pharmacy services and a lower adjusted effective tax rate.

29.     CEO Wentworth elaborated, noting that the Defendants "remain confident in our goal of achieving $1 billion in cost savings this year.  We are continuing to strategically review our portfolio over the next three months in an effort to ensure it drives growth and delivers value."

30.     An earnings call was held the same day in which CEO Wentworth pertinently detailed the pharmacy division's performance:

> "***We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio***. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing. We're seeing benefits such as improved NPS scores, patient retention and adherence …earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as ***demand for pharmacy services increases while the industry faces a pronounced labor shortage.*** We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.
>
> WBA's second quarter operational results were in line with our expectations despite continued challenges in the U.S. retail environment. ***Adjusted EPS of $1.20 reflects good execution and cost discipline in our U.S. Retail Pharmacy segment***, continued strong performance in International, our first quarter of positive adjusted EBITDA in U.S. Healthcare and positive impacts from tax planning benefits.
>
> . . .

13

We are narrowing full year adjusted EPS guidance to a range of $3.20 to $3.35. This guidance reflects a challenging retail environment in the U.S. and our decisions to both wind down the sale-leaseback program and to sell additional shares of Cencora in a further effort to simplify our financial reporting.

. . .

Over the next 3 months, we will continue the intense review of our portfolio of assets in an effort to ensure that each contributes to the growth we aspire to deliver and drives our go-forward strategy to be the leading retail pharmacy and health services partner that creates deep relationships and trust.

Let me share further detail on the progress happening across our businesses to date. In our U.S. Retail Pharmacy business, we are navigating a challenging backdrop and exploring innovative pathways to boost profitability and growth. Within retail, our U.S. customer is confronting considerable pressure from multiyear inflationary trends and depleted household savings with U.S. household debt at record levels and delinquency rates on the rise.

. . .

Moving to Pharmacy. ***We delivered another quarter of strong execution with out-performance in pharmacy services led by our vaccines portfolio***. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers ***as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing***.

We're seeing benefits such as improved NPS scores, patient retention and adherence.

In fact, earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as demand for pharmacy services increases while the industry faces a pronounced labor shortage. We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.

(Emphasis added).

31. Defendant Mahajan then took over to provide more detail on the pharmacy division's performance and updates on the Company's projections:

Let me now turn to U.S. pharmacy. ***Pharmacy comp sales increased 8.7%, mainly driven by brand inflation, volume growth and contribution from pharmacy services***. Comp scripts grew 2.9%, excluding immunizations, in line with the overall prescription market. The ongoing impact of Medicaid redeterminations continued to negatively impact overall market growth.

***Pharmacy Services performed better than expectations, driven by our vaccines portfolio. Pharmacy adjusted gross profit was down slightly versus the prior year quarter with margin negatively impacted by brand mix impacts and reimbursement pressure net of procurement savings.***

Turning next to our U.S. Retail business. We continue to see a challenging retail environment with a shift in discretionary spend away from the drug channel as consumers seek value. Comparable retail sales declined 4.3% in the quarter.

There were 3 main drivers. First, as consumers continue to pull back on discretionary spending, we saw an impact of approximately 170 basis points from weaker sales in holiday seasonal and general merchandise categories.

***Second, as expected, we saw a weaker than normal respiratory season, which directly impacted comparable sales by approximately 90 basis points. Third-party data showed flu, cold and respiratory activity was down 6% compared to the prior year quarter. In addition, as cough, cold, flu serves as a primary trip driver, there was also an incremental impact from the lower attachment sales.***

Lastly, weather conditions in January led to a headwind of approximately 40 basis points in the quarter. Retail gross margin declined year-on-year, impacted by higher shrink partly offset by benefits from category performance improvement program.

. . .

I will now turn to guidance. ***We are narrowing our fiscal '24 adjusted EPS guidance to $3.20 to $3.35***. The updated range incorporates a challenging U.S. retail environment, lower sale leaseback gains and reduced Cencora equity income, ***offset by the execution in pharmacy services and a lower adjusted effective tax rate***.

***On the tailwinds, we continue to see strong execution in our pharmacy services business, which has delivered results ahead of our initial plan to date.*** In addition, we now expect our adjusted effective tax rate to be under 5%.

On the headwinds, we expect the challenging retail backdrop will continue to negatively impact our U.S. retail sales in the short term. We now expect fiscal '24 retail comp sales to be down approximately 3%. Second, with the early wind down of the sale-leaseback program, no material gains are expected in the future.

15

Third, the block sale of Cencora shares in February will reduce equity earnings going forward. Lastly, as discussed with the first quarter results, we forecast slightly lower market growth in U.S. pharmacy business compared to our initial guidance.

(Emphasis added).

32.     The above statements in Paragraphs 21 to 31 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Walgreens' optimistic reports of growth, cost cutting measures, and overall stability of its pharmacy division fell short of reality; the Company's pharmacy division was not equipped to handle the ongoing challenges in its industry and, further, would require significant restructuring to create a sustainable model.

### The Truth Emerges during Walgreens' Third Quarter Earnings Report

#### June 27, 2024

33.     On June 27, 2024, Defendants released their Q3FY24 results below expectations and lowered FY24 projections:

Adjusted EPS was $0.63, down 36.6 percent on a constant currency basis compared to the year-ago quarter

…

Lowering fiscal 2024 adjusted EPS [guidance to $2.80 to $2.95 reflecting challenging pharmacy industry trends and a worse-than-expected U.S. consumer environment.

34.     CEO Wentworth further noted that the Company continues "to face a difficult operating environment, including persistent pressures on the U.S. consumer and the impact of recent marketplace dynamics which have eroded pharmacy margins."

35.     An earnings call was again held the same day in which the Individual Defendants elaborated on the third quarter results and the perceived issues that resulted the mixed results:

[T]his quarter's results were not in line with our expectations.

. . .

For the third quarter, we delivered adjusted earnings per share of $0.63, reflecting significant challenges in the U.S. Retail Pharmacy business stemming from a worse-than-expected consumer environment and challenging pharmacy industry trends, partially offset by strength in U.S. Healthcare and International. In light of these factors, we are reducing our full year outlook, which Manmohan will take you through in more detail.

In ***U.S. Retail Pharmacy, we witnessed continued pressure on the U.S. consumer. Our customers have become increasingly selective and price-sensitive in their purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach***. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies.

We also ***continue to face an incrementally challenging pharmacy industry***. Recent trends, such as branded mix impacts and increased regulatory and reimbursement pressures, including fluctuations in NADAC pricing, have negatively impacted pricing dynamics. Additionally, the script market is growing but continues to trail below pre-pandemic growth levels.

These headwinds have affected our performance and are materially weighing on our ability to serve patients profitably. ***We are at a point where the current pharmacy model is not sustainable***, and the challenges in our operating environment require we approach the market differently.

Third quarter sales grew 2.5% on a constant currency basis. U.S. Retail Pharmacy increased 2.3%, International was up 1.6%, and U.S. Healthcare delivered sales growth of 7.6%.

As Tim mentioned, overall results were below our expectations. Adjusted EPS of $0.63 decreased 37% year-over-year on a constant currency basis. This was driven by a $0.24 impact from lower sale leaseback gains, a challenging U.S. retail environment and recent pharmacy trends.

. . .

***Adjusted EPS declined 25% on a constant currency basis due to the softer U.S. Retail Pharmacy performance and significantly lower sale leaseback gains***. This was partly offset by cost-saving initiatives, improved profitability in U.S. Healthcare and a lower adjusted effective tax rate.

. . .

Now let me cover U.S. Retail Pharmacy segment. Comparable sales grew 3.5% year-on-year driven by brand inflation in pharmacy and prescription volume, partly offset by a decline in retail sales. AOI decreased 48% versus the prior year quarter. Approximately 70% of this decline relates to lower sale leaseback gains lapping reduced incentive accruals in the prior year and lower Cencora equity income. Challenging retail and pharmacy industry trends also negatively impacted AOI in the current period.

Sale leaseback gains, net of incremental rent expense, resulted in a $277 million headwind to AOI in the quarter. As discussed 3 months ago, we do not anticipate any material benefits from sale leaseback gains going forward. Headwinds in the retail and pharmacy businesses were partly offset by cost savings initiatives.

Let me now turn to U.S. pharmacy. ***Pharmacy comp sales increased 5.7% driven by brand inflation and volume growth. Comp scripts, excluding immunization, grew 1.7% in the quarter.*** We are tracking in line with the overall prescription market year-to-date. However, overall prescription market growth remains below expectations primarily due to Medicaid redeterminations.

Pharmacy adjusted gross margin declined versus the prior year quarter driven by brand mix impacts, reimbursement pressure reflecting last year's negotiations, lower COVID testing demand and incremental pressure from certain generic launches with procurement dynamics similar to brands. Recent fluctuations in NADAC drove an incremental $20 million of the partial quarter impact.

(Emphasis added).

36.    The discussion then turned to future projections for the remainder of the fiscal year.

Defendants Mahajan and Wentworth provided the following explanation for the reduced guidance

and plans going forward:

I will now turn to guidance. We are lowering our fiscal '24 adjusted EPS guidance to $2.80 to $2.95. The updated range versus our expectations 3 months ago incorporates two key items.

First, the U.S. consumer environment has not improved and is driving higher promotional activity, negatively impacting retail margin. We continue to expect fiscal '24 retail comp sales to be down approximately 3%.

***Second is the continuation of worse-than-expected pharmacy margin headwinds. Pharmacy margins in the second half include impact from certain generic***

*launches with procurement dynamics similar to brands, fluctuations in NADAC, inflation and mix within branded drugs and lower overall market growth.*

We are maintaining full year expectations for U.S. Healthcare segment adjusted EBITDA to be breakeven at the midpoint of the guidance range. We continue to expect our adjusted effective tax rate to be under 5%. Our revised full year guidance range implies fourth quarter adjusted EPS of approximately $0.39 at the midpoint.

. . .

So let me begin this discussion around our strategic decisions with our core business, U.S. Retail Pharmacy. The success of the business hinges on an efficient, highly relevant customer experience, and we've launched a multifaceted action plan for improvement.

As the convenient destination for millions of customers and driving $27 billion of retail sales, the store and its digital channels are central to our strategy and consumer experience. But the customer has evolved, demographics and preferences have shifted, and we need to reposition and operate our stores accordingly. Currently, 75% of our U.S. stores contribute roughly 100% of segment AOI. For the remaining 25% of the stores in our network which are not currently contributing to our long-term strategy, changes are imminent.

To start, we are finalizing a multifactor store footprint optimization program which we expect will include the closure of a significant portion of these underperforming stores over the next 3 years. Plans to finalize the number are in motion and we will update you in due course.

For the remaining portion of this cohort, we are taking action to return them to profitability and deliver an improved customer experience. We will contemplate additional closures if performance does not improve, which includes external factors such as reimbursement rates.

(Emphasis added).

37.     The question-and-answer portion of the call again followed, wherein the Individual Defendants were asked at length about the Company's below-expectation projections and, particularly, their plans for the pharmacy division:

<Q: Lisa Christine Gill – JPMorgan Chase & Co – Analyst> I really just want to understand just a couple of things a little bit better. One, you started with your 4 thoughts and that the core will be different than what we see today. *So one, what do you view is the future of pharmacy?* And within that, can you talk about the

conversations that you're having with payers and PBMs around what the new reimbursement model would look like?

And then just my second question would be, just when we think about the financial side, you called out NADAC pricing on Medicaid. And I think Manmohan said that it was $20 million in this quarter. Is that a material number when we think about going forward? If you can put any numbers around that, would be great.

<A: Timothy C. Wentworth> Thanks, Lisa. So big question, future of pharmacy, I'll take quickly. And then I'll let Mary Langowski talk a little bit more detail about our payer conversations. Obviously, we won't get specific. But needless to say, they have, I think, changed both in tenor and content and are constructive. And then I'll let Manmohan talk about NADAC.

As far as the future of pharmacy, retail pharmacy in particular, which we talk about the store as part of an overall experience. We are working to essentially meet the consumer where they are today and where they need us to be. And there are a number of elements to that, both in the back of the store and in the front of the store. And so – and I don't want to take as much time as it would take you in detail through all of those pieces.

. . .

<A: Mary Langowski> Yes. Thank you, Tim, and thank you, Lisa. Quite frankly, we are laser-focused on being paid fairly for the value we provide. And put simply, the playbook is a bit dated and does not account for, nor does it adequately or fairly pay for, the role and value that we think the pharmacist is bringing and delivering services.

We also don't think it accounts adequately for the complexity that we now face in the system. And it certainly doesn't facilitate putting pharmacotherapy and behavioral interventions at the center of chronic disease management in this country. We think that has to change, and so we're collaborating with our PBM partners across the industry to make those changes.

. . .

<A: Manmahoan Mahajan> This -- so on NADAC, maybe a couple of thoughts. First, we've seen significant fluctuations in the last several months on the index itself. We had $20 million of impact in the quarter, ***but you got to think about that was a partial quarter impact***. We have seen some improvement as the index, again, was updated in June. However, we are taking a very prudent approach as it relates to Q4 and the guidance for the year. And I'd say this is one of the reasons -- the fluctuations we've seen on NADAC is one of the reasons why we have the broader range as we put out the fiscal year guidance at this point.

. . .

<Q: Eric R. Percher – Nephron Research LLC – Partner & Research Analyst> Two related questions relative to gross margin in the pharmacy. And I think, first, if we look at the retail gross margin, it appears to be at a low point relative to the last 10 years. Can you give us a bit more on the discounting that you engaged in and your expectation for that through the fourth quarter and how you expect it to taper?

And then the second part is, looking at NADAC, if it was $20 million over a month and change and you're saying conservative over the second or this full quarter, are you assuming that there's still more expansion as it flows from Medicaid to commercial? Or do you think we can -- we've kind of seen the peak in this 1 month and change?

<A: Timothy C. Wentworth> Sure. I'm going to pass it to Manmohan in just a second. What I'd say is, first of all, as it relates to commercial and NADAC, I believe what Rick would say if I passed it over to him would be that, while we do have some commercial contracts that use NADAC, those conversations we're having around sort of neutrality in terms of outcomes. That's actually the easier part of NADAC, quite frankly.

As it relates to the gross margin in pharmacy, I will pass it to Manmohan. And as I quickly would point out, gross margin is not only discounting, it is also mix and so forth. And so Manmohan, if you want to talk more about that.

<A: Manmohan Mahajan> Yes, sure. So as you think about the gross margin on the retail pharmacy side, maybe a couple of things there. Let me start on the retail side. And what we've experienced in the third quarter, and we think the trend is going to continue in Q4, *is the environment didn't improve as we anticipated*. And as a result, we focused on investing in price and promotion. Now we've seen the unit and sales uplift as a result thereof. But at the same time, there was impact on gross margin in the short term. And so that is coming through, and we expect that's going to continue along the same lines in Q4.

The second piece that does impact our gross margin year-over-year is the level of shrink. And I think we talked about shrink in the last couple of calls as well. We have seen it on an increasing trend, and there are a number of actions that Tracey and the team are taking to bring it back to historical normals.

On the pharmacy side then on the margin, a couple of themes playing out. NADAC is one of them, significant fluctuation as I said earlier in the call. We have seen some level of improvement as the index itself changed in June. But as I said, we're -- at this point, the level of fluctuations we have seen month-over-month, we're just being prudent in terms of what can play out here in Q4.

Outside of that, the last point I'd say is there are some market dynamics that we experienced in Q3 as well, and some will play in Q4. And maybe a couple of those to point out is there are certain generic launches where the procurement dynamics continues to be just like branded. And so that is impacting our gross margin on the pharmacy side.

And then lastly, I'd say the mix that's coming in on the branded side is also having a negative impact on the margin. So that's maybe overall profile of what's driving our margin in the quarter.

. . .

<Q: Ann Kathleen Hynes – Mizuho Securities USA LLC – Managing Director of Americas Research> I have two questions. One is just about your commentary around prescriptions and not back to pre-pandemic level. I guess I find that a little surprising just because overall health care utilization is so strong. So do you think it's a market share issue? Is it a pharmacist issue? I know you lost some pharmacists during the pandemic. Maybe if you can provide some updates on that. I know you mentioned Medicaid, but it was my understanding Medicaid's pretty small as a percentage of total revenue. So any other detail would be great.

And my second question is just, I guess, bigger picture. I know you're not giving all the details on the strategic review, but your stock is down a lot, pre-market. Like do you have a sense for maybe some of your longer-term investors, when you think you could stabilize operating profit in the retail segment and free cash flow? Is it like a 2026 time frame? Like any update on the time frame when you think you can recover this business would be great.

<A: Timothy C. Wentworth> Sure. And by the way, we share the same goal that your second question implicitly implies, which is to be very clear. ***As you've heard us say -- or let me make sure you hear us say, we actually have a really strong level of conviction around the core business that we are remodeling here***. It will be a very different Walgreens in a lot of ways, a different experience.

But by the same token, we see a clear stabilization and actual growth path for that business. It is going to take time. We're not going to give you guidance, but it's quarters, not months. It's not necessarily multiple years, but it is probably a period of time that we will have to demonstrate to you, and frankly to our consumer, that we are going to deserve their preference.

As it relates to the share dynamics and sort of why share is growing more slowly. And you're right, it's not just Medicaid, although that does impact things. The Medicaid reenrollment challenges, by the way, which many of our urban stores could have played a role in if we were to have a closer relationship with Medicaid. And we are having some of those discussions. Do -- is one factor.

But Rick, do you want to talk more broadly?

<A: Rick Gates> Yes, Ann. ***And I think as you look at volume, I think we stated that we are growing with market right now***. So it's not just a Walgreens thing. It is a market dynamic.

And so when you look at Medicaid redetermination as an example, Medicaid enrollment really ballooned during the pandemic as obviously they were not moving people outside of the Medicaid coverage. And so what we've seen is that states has continued to move patients out. We're seeing upwards of -- closer to 18 million to 20 million individuals who have moved out of Medicaid coverage and either have to go out and find coverage like either discount cards, individual plans, or get into commercial plans. And so we've seen a dynamic where they actually have not picked up coverage as quickly, and utilization has dropped.

***And so what I think we're seeing is that, pandemic, we were running closer to 4%, 4.5% towards the end of it from a market growth perspective. Pre-pandemic, it was closer to 2.5%. And I think what we're seeing right now is we're actually running below the 2.5% from a market perspective. And obviously, we're trying to track with that.***

(Emphasis added).

38.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the October 12, 2023, January 4, 2024, and March 28, 2024 earnings calls. On those calls, Defendants continually praised the pharmacy division's brand inflation, volume growth, cost execution, discipline, and contribution to the Company, while continually minimizing risks associated with seasonality and the potential impact of the macro environment on the pharmacy division's future profitability.

39.     Investors and analysts reacted immediately to Walgreens' revelation. The price of Walgreens' common stock declined dramatically. From a closing market price of $15.66 per share on June 26, 2024, Walgreens' stock price fell to $12.19 per share on June 27, 2024, a decline of about 22.16% in the span of just a single day.

40.     A number of well-known analysts who had been following Walgreens lowered their price targets in response to Walgreens' disclosures. For example, Raymond James, while

reiterating their market perform rating post drop summarized that "[a]ll in all, it was probably the weakest quarter in the US retail pharmacy business we've seen." The analyst went on to note that it is "[s]afe to say there is wood to chop here as WBA has to rationalize ~2,200 stores over the next 3 years, work to revamp the retail experience to compete with the likes of AMZN, and WMT, while also attempting to stabilize the pharmacy business, and find ways to partially monetize its VillageMD position. We are unaware of any retailer successfully adopting a 'shrink to survive' strategy and WBA's cost savings, to date, have yet to keep up with the decline in the core retail business."

41.     Similarly, Deutsche Bank, while considerably reducing their price target, cautioned that WBA is "in a bit of a downward spiral as there doesn't seem to be any type of strategy around growth with all of management's efforts focused on maintaining its retail earnings base and managing cash obligations."

42.     The fact that these analysts, and others, discussed Walgreens' shortfall and below-expectation projections suggests the public placed significant weight on Walgreens' prior revenue and sales estimates. The frequent, in-depth discussion of Walgreens' guidance confirms that Defendants' statements during the Class Period were material.

### *Loss Causation and Economic Loss*

43.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Walgreens' common stock and operated as a fraud or deceit on Class Period purchasers of Walgreens' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Walgreens' common stock materially declined, as the prior artificial inflation

came out of the price over time. As a result of their purchases of Walgreens' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

44. Walgreens' stock price fell in response to the partial corrective event on June 27, 2024, as alleged *supra*. On June 27, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Walgreens' forecasting processes and growth guidance.

45. In particular, on June 27, 2024, Walgreens announced significantly below-market growth expectations, reducing their own prior guidance for fiscal year 2024 by more than 12%.

### *Presumption of Reliance; Fraud-On-The-Market*

46. At all relevant times, the market for Walgreens' common stock was an efficient market for the following reasons, among others:

(a) Walgreens' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Walgreens communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Walgreens was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Walgreens was reflected in and incorporated into the Company's stock price during the Class Period.

47.     As a result of the foregoing, the market for Walgreens' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Walgreens' stock price. Under these circumstances, all purchasers of Walgreens' common stock during the Class Period suffered similar injury through their purchase of Walgreens' common stock at artificially inflated prices, and a presumption of reliance applies.

48.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

50.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

51.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Walgreens who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Walgreens' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walgreens' common stock were actively traded on

the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Walgreens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of May 31, 2024, there were 863 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

54.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Walgreens;

(c)     whether the Individual Defendants caused Walgreens to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Walgreens' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **COUNT I**

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Walgreens common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Walgreens' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Walgreens' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

62.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew

or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Walgreens' internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Walgreens' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Walgreens' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Walgreens' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Walgreens' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares

of Walgreens' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Walgreens' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Walgreens' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

68.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Walgreens' misstatements.

70. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Walgreens which had become materially false or misleading.

71. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Walgreens disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Walgreens to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Walgreens' common stock.

72. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Walgreens to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73. By reason of the above conduct, the Individual Defendants and/or Walgreens are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 12, 2024                    Respectfully submitted,

                                        **LUBIN AUSTERMUEHLE, P.C.**

                                        s/ Peter S. Lubin
                                        Peter S. Lubin
                                        Patrick D. Austermuehle
                                        Lubin Austermuehle, P.C.
                                        17W220 22nd Street, Suite 410
                                        Oakbrook Terrace, IL 60181
                                        Tel: (630) 333-0333
                                        peter@l-a.law
                                        patrick@l-a.law

                                        Terrence Buehler
                                        LAW OFFICE OF TERRENCE BUEHLER
                                        417 North Marion Street
                                        Oak Park, IL 60302
                                        (312) 371-4385
                                        tbuehler@tbuehlerlaw.com

                                        *Liaison Counsel for Plaintiff*

34

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 17th Floor
New York, N.Y. 10006
Tel.: (212) 363-7500
aapton@zlk.com

*Lead Counsel for Plaintiff and the Class*