**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re Walgreens Boots Alliance Securities Litigation | Case No.: 1:24-cv-05907-MMR<br><br>Hon. Mary M. Rowland<br><br><u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

I.   STATEMENT OF FACTS .......................................................................................... 5

     A.   Desperate for Growth, Defendants Announce Their "Transformational"
          Strategic Shift To Healthcare By Investing in VillageMD and Rolling Out
          Full-Service Doctor Offices At Walgreens Stores .................................................. 5

     B.   Throughout The Class Period, Defendants Repeatedly—And Falsely—
          Assure Their "Bold" VillageMD Strategy Was "Working" ................................... 6

     C.   Defendants Knew VillageMD Underperformed In Every Region and Their
          Strategy Never "Worked," Rendering Their Statements Baseless ........................ 7

     D.   The Truth Gradually Emerges, But Defendants Continue To Mislead
          Investors ............................................................................................................. 9

II.  ARGUMENT.......................................................................................................... 10

     A.   The Complaint Adequately Alleges Material Misstatements and
          Omissions........................................................................................................... 10

          1.   Defendants' Assurances that the VillageMD Strategy Was "Working,"
               "Highly Scalable," And "On Track" To Deliver "Over Half" the
               Company's EPS Growth Were False And Materially Misleading ........... 11

          2.   Touting VillageMD Clinic "Openings" Was Materially Misleading ....... 14

          3.   Touting Guidance and Milestones Was Materially Misleading ............... 17

          4.   Defendants' Medicaid Statements Were Materially Misleading ............. 19

          5.   Defendants' Opinion Statements Are Actionable ................................... 19

          6.   The Safe Harbor Provides No Protection................................................. 20

     B.   The Complaint Adequately Alleges Scienter........................................................ 22

          1.   The Complaint Alleges A Strong Inference Of Scienter ......................... 23

          2.   Defendants' Attempt To Refute Scienter Fails ....................................... 27

          3.   Defendants Fail to Proffer a More Compelling Inference ....................... 29

III. CONCLUSION...................................................................................................... 30

i

**TABLE OF AUTHORITIES**

**Cases**

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ..................................................................... *passim*

*Anderson v. Abott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. Jan. 25, 2001).......................................................................... 16

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004), as amended (Sept. 3, 2004)...................................................... 21

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ..................................................................... *passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................................. 14

*Blatt v. Corn Prods. Int'l, Inc.*,
2006 WL 1697013 (N.D. Ill. June 14, 2006) ........................................................................... 12

*Busic v. Orphazyme A/S*,
2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ........................................................................... 30

*Carpenters Pension Tr. Fund for Northern California v. The Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ........................................................................... 25

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) ..................................................................... 16, 20

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025)......................................................................... 27, 28

*City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ............................................................................. 29

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020)............................................................................ 28

*Conlee v. WMS Indus., Inc.*,
2012 WL 3042498 (N.D. Ill. July 25, 2012)............................................................................ 10

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ................................................................................................... 27

*Davis v. SPSS, Inc.*,
431 F. Supp. 2d 823 (N.D. Ill. 2006)....................................................................................... 29

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009)....................................................................................... 28

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ........................................................................... 26

*Fosbre v. Las Vegas Sands Corp.*,
2013 WL 5970250 (D. Nev. Nov. 7, 2013) .............................................................................. 11

ii

*Fryman v. Atlas Fin. Holdings, Inc.*,
  2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ....................................................... 13, 14, 20, 23

*Garden City Emps.' Ret. Sys. v. Anixter Intern., Inc.*,
  2011 WL 1303387 (N.D. Ill. Mar. 31, 2011) .................................................................... 29

*Goucher v. Iterum Therapeutics plc*,
  648 F. Supp. 3d 962 (N.D. Ill. 2022) ............................................................................. 18

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ............................................................................ 16

*Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v.*
  *Fifth Third Bancorp*,
  2022 WL 1642221 (N.D. Ill. May 24, 2022) .................................................................. 16

*Hedick v. The Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ......................................................... *passim*

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ............................................................. 10, 16

*In re Advance Auto Parts, Inc.*,
  2020 WL 599543 (D. Del. Feb. 7, 2020) ....................................................................... 20

*In re Akorn Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ......................................................................... 13, 17

*In re Apache Corp.*,
  2022 WL 4277350 (S.D. Tex. Sept. 15, 2022), report and recommendation adopted,
  2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) ............................................................. 30

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ............................................................ 13, 28

*In re Baxter Int'l Inc. Sec. Litig.*,
  2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .................................................................... 27

*In re Ford Motor Co. Sec. Litig.*,
  381 F.3d 563 (6th Cir. 2004) ........................................................................................ 16

*In re Golden Heaven Grp. Hldgs. Ltd. Sec. Litig.*,
  2025 WL 714171 (C.D. Cal. Mar. 3, 2025) ............................................................... 22, 29

*In re Midway Games Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) .......................................................................... 21

*In re NeoPharm, Inc. Sec. Litig.*,
  2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ..................................................................... 17

*In re Next Level Systems, Inc.*,
  1999 WL 387446 (N.D. Ill. Mar. 31, 1999) .................................................................. 21

*In re Spiegel, Inc. Sec. Litig.*,
  382 F. Supp. 2d 989 (N.D. Ill. 2004) ............................................................................ 14

*In re Supreme Indus., Inc. Sec. Litig.*,
   2018 WL 2364931 (N.D. Ind. May 23, 2018) ...................................................... 29

*In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*,
   604 F. Supp. 2d 1188 (N.D. Ill. 2009) ............................................................. 24

*Kelsey v. Allin*,
   2016 WL 825236 (N.D. Ill. Mar. 2, 2016) ........................................................ 15

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .......................................................................... 15

*Lauria v. Biosante Pharm., Inc.*,
   968 F. Supp. 2d 951 (N.D. Ill. 2013) .............................................................. 10

*Lowry v. RTI Surgical Holdings, Inc.*,
   532 F. Supp. 3d 652 (N.D. Ill. 2021) .............................................................. 29

*Macovski v. Groupon, Inc.*,
   553 F. Supp. 3d 460 (N.D. Ill. 2021) ................................................... 14, 16, 18

*Macquarie Infrastructure Corp. v. Moab Partners*, L.P.,
    601 U.S. 257 (2024) ..................................................................................... 16

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ..................................................................... 12, 28

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702, 705 (7th Cir. 2008) ........................................................ 21, 26, 30

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ...................................................................................... 19

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
   690 F. Supp. 3d 862 (N.D. Ill. 2023) .............................................................. 22

*Pierrelouis v. Gogo, Inc.*,
   2021 WL 1608342 (N.D. Ill. Apr. 26, 2021) ......................................... 18, 21, 24, 30

*Pierrelouis v. Gogo, Inc.*,
   414 F. Supp. 3d 1164 (N.D. Ill. 2019) ............................................................ 27

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v.*

   *Allscripts-Misys Healthcare Solutions, Inc.*,
   778 F. Supp. 2d 875 (N.D. Ill. 2011) .......................................................... 12, 27

*Pubs. Empls.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
   2018 WL 844420 (N.D. Ill. Feb. 12, 2018) .................................................... 13, 22

*Rensin v. U.S. Cellular Corp.*,
   2024 WL 4651837 (N.D. Ill. Nov. 1, 2024) ................................................. *passim*

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................................................... 28

*Ross v. Career Educ. Corp.*,
   2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ................................................. *passim*

iv

*Roth v. OfficeMax, Inc.*,
   527 F. Supp. 2d 791 (N.D. Ill. 2007) ............................................................................... 27

*Rubinstein v. Gonzalez*,
   241 F. Supp. 3d 841 (N.D. Ill. 2017) ............................................................................... 23

*SEC v. Kameli*,
   2020 WL 2542154 (N.D. Ill. May 19, 2020) ................................................................. 10

*SEC v. Winemaster*,
   529 F. Supp. 3d 880 (N.D. Ill. 2021) ............................................................................... 10

*Seeks v. Boeing Co.*,
   2024 WL 4367846 (N.D. Ill. Sept. 30, 2024) ............................................... 10, 12, 14

*Selbst v. McDonald's Corp.*,
   2005 WL 2319936 (N.D. Ill. Sept. 21, 2005) ................................................................. 20

*Shupe v. Rocket Cos., Inc.*,
   660 F. Supp. 3d 647 (E.D. Mich. Mar. 8, 2023) ........................................................ 27

*Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*,
   2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ............................................................... 20

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
   2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ................................................................. 22

*Stavros v. Exelon Corp.*,
   266 F. Supp. 2d 833 (N.D. Ill. 2003) ............................................................................... 21

*Takara Tr. v. Molex Inc.*,
   429 F. Supp. 2d 960 (N.D. Ill. 2006) ............................................................................... 22

*Teamsters Affiliates Pension Plan & Int'l Brotherhood of Teamsters General Fund and Retirement and Protection Plan v. Walgreens Co.*,
   No. 08-C-2162 (N.D. Ill. Sept. 24, 2009) ................................................................. 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ........................................................................ 22, 23, 27, 28

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ............................................................................... 14

**Statutes**

15 U.S.C. § 78u-5(c)(1)(A) ............................................................................................... 21

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 10

SEC Rule 10b-5 ............................................................................................... 10

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| "1Q23" | First quarter of FY23 |
| "2Q22" | Second quarter of FY22 |
| "2Q24" | Second quarter of FY24 |
| "4Q22" | Fourth quarter of FY22 |
| "Admin." | Administrator |
| "Appx." | Plaintiffs' Appendix A submitted herewith as an attachment to the Declaration of Gregory M. Potrepka In Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint |
| "Ariz." | Arizona |
| "Bus." | Business |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Complaint" or "CAC" | Plaintiffs' Consolidated Class Action Complaint For Violations of the Federal Securities Laws (ECF 50) |
| "Class Period" | October 14, 2021 to June 26, 2024, inclusive |
| "Companies" | Walgreens Boots Alliance, Inc. and VillageMD |
| "EVP" | Executive Vice President |
| "Motion" or "DB" | Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (ECF 57) |
| "Dir." | Director |
| "DX" or "DXS" | Defendants' Exhibits attached to the Declaration of Jessica Valenzuela (ECF 57-2) and appended to their Motion (ECF 57-3 through 57-61) |
| "EBITDA" | Earnings before interest, taxes, depreciation, and amortization |
| "ECF" | Electronic court filing docket entries in the above-captioned action |
| "Exec." | Executive |
| "Fla." | Florida |
| "FY__" | Walgreens' Fiscal Year, which begins September 1 and ends August 31 |
| "Ga." | Georgia |
| "Pilot" | Walgreens' 2019 pilot program with VillageMD consisting of five co-located primary care clinics at Walgreens stores in Houston, Texas |
| "Ill." | Illinois |
| "Ind." | Indiana |
| KPI | Key Performance Indicator |
| "Mgmt." | Management |
| "Nat'l" | National |
| "Ops." | Operations |

| "PX" or "PXS" | Plaintiffs' Exhibits submitted herewith as an attachment to the Declaration of Gregory M. Potrepka In Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint |
|---|---|
| "R.I." | Rhode Island |
| "Tex." | Texas |
| "VP" | Vice President |
| "Walgreens," "WBA," or the "Company" | Walgreens Boots Alliance, Inc. |

This case concerns Defendants' years-long campaign of misrepresenting and concealing what was the largest debacle in Walgreens' history—the Company's desperate and catastrophic venture into the primary health care industry.[1] In the years leading up to the Class Period, the retail pharmacy business of Walgreens and its competitors struggled amidst sluggish sales and slim profit margins. While peers dealt with this downturn by entering the burgeoning healthcare industry for growth, Walgreens stood aside and saw its stock price languish—in the five years leading up to the Class Period, the Company's stock price lost nearly *50%* of its value.

In 2019, Walgreens belatedly followed suit with a purportedly "transformational" strategy: it would become the first U.S. pharmacy chain to offer full-service primary healthcare co-located under one roof. Specifically, Walgreens partnered with VillageMD, a startup physician network, and dubbed its new co-located clinics: "Village Medical at Walgreens." Walgreens hired a new management team to implement the strategy; invested $10 billion in it; reorganized the Company around it; pinned Walgreens' entire future on its success; and—significantly—repeatedly and consistently represented the strategy was a resounding success. Yet, remarkably, in less than four years, this purportedly "transformational" strategy decimated Walgreens, costing it over ten billion dollars in losses and ultimately resulting in its demise as an independent public company.

The Class Period begins on October 14, 2021, when Walgreens invested over $5 billion to accelerate the rollout of over 1,000 VillageMD clinics and told investors that VillageMD was "***the key to unlock material, enhanced, long-term growth***." For the next 2½ years, Defendants relentlessly touted the strategy's progress and purported success, maintaining unequivocally that "***our strategy is working***," "***the VillageMD model works***," and "***we don't see any challenges***."

---

[1] Unless otherwise noted: (i) capitalized terms have the same meanings as in the Complaint, ECF 50, or the Table of Abbreviations, at vi, *supra.*; (ii) all emphasis is added; and (iii) internal citations, brackets, ellipses, footnotes, and quotations are omitted.

1

Reinforcing the misimpression of a flawless rollout, Defendants announced each time Walgreens opened new clinics and urged investors to rely on the raw number of clinics opened as a "***key performance indicator***" "***when analyzing [Walgreens'] core operating performance***." Moreover, Defendants routinely issued baseless earnings guidance attributing ***half*** of Walgreens' total EPS growth to VillageMD. Defendants' statements had their intended effect: Walgreens' shares soared 7% on the first day of the Class Period and later reached a Class Period-high of over $54 per share.

However, Defendants' statements were ***utterly false and omitted highly material facts***. Indeed, no fewer than 21 former employees of both VillageMD and Walgreens—located across the country and spanning all organizational levels—uniformly confirmed that, contrary to Defendants' representations, VillageMD clinics in every market dramatically underperformed Walgreens' internal performance targets from the rollout's inception, and never improved. While Defendants repeatedly boasted about the number of clinics they were opening, the majority of these clinics did not even have the most fundamental requirement for the initiative to succeed: physicians to operate them. As these CWs confirmed, "***well upwards of 50% of Village clinics [nationwide] had staffing shortages***," as physicians recoiled at the notion of being relegated to a "***doc-in-a-box***," so clinics "***sat empty for months***." In fact, there was such a severe shortage of doctors willing to practice medicine at a Walgreens, and such a dearth of patients willing to receive healthcare at one, that at least ***70%*** of the clinics were "***dismal failures***."

Significantly, Defendants not only concealed material adverse information about VillageMD's progress, but also misrepresented the strategy's success to investors. For example, by June 2022, the VillageMD clinics were performing so poorly and were so costly to operate that Walgreens secretly shut the rollout down. And yet, when analysts directly asked about VillageMD's performance, Defendants flat-out lied and continued to portray the initiative as a

2

resounding success. Indeed, even four months *after* abandoning the rollout, Kehoe claimed that the "***clinic rollout at VillageMD continues on pace***," and that the rollout was so successful that Walgreens was "***doubling down***" on VillageMD "***investments***." Brewer added the "***strategy is working***" and "***build[ing] a solid foundation for sustainable shareholder value creation***."

Similarly, when the Companies terminated all employees responsible for opening clinics in mid-2023, Defendants deliberately concealed this highly material information and continued to mislead investors. For example, in September 2023, when an analyst specifically asked whether Walgreens still planned on opening 1,000 co-locations by 2027, Driscoll falsely replied "***Yes***." In late 2023 and early 2024, even as Walgreens was forced to announce clinic closures, Driscoll continued to stridently assure investors that the "***Village model works***"; Mahajan proclaimed "***[w]e are making progress to accelerate profitability at VillageMD***"; and Wentworth (the new CEO) declared "***there's no question***" VillageMD was "***on a good path***" for Walgreens' overall business.

The fraud unraveled in stunning fashion. In June 2023, Walgreens disclosed massive losses for the new U.S. Healthcare segment that were well below its guidance and analysts' estimates, and dramatically reduced EPS guidance by 20% due to VillageMD's abysmal performance. Shortly thereafter, Defendants Brewer and Kehoe suddenly "resigned" without explanation in the span of a month; Walgreens announced the first annual loss in its history and an extraordinary $12.4 billion write-down in the value of VillageMD; and Wentworth revealed that the "transformational" strategy was so unsalvageable that Walgreens was seeking to completely divest its interest in VillageMD. As the truth emerged, Walgreens' stock suffered steep declines, including a one-day drop of 22% that was the largest in its history and the largest decline of all companies in the S&P 500. Ultimately, the losses caused by VillageMD were so massive that Walgreens was no longer able to continue operating as a public company. In March 2025, the Company disclosed that it was

3

forced to sell itself to a private equity firm at a fire sale price of $10 billion—a fraction of its $100+ billion market capitalization before announcing the VillageMD strategy.

In their Motion, Defendants ask the Court to ignore these damning facts and adopt an alternate reality where the VillageMD strategy was actually a success and Walgreens' decision to jettison the strategy was merely a change in direction prompted by a "strategic review" by new management.[2] Defendants' arguments are baseless, defy common sense, and can be easily rejected.

Regarding falsity, Defendants argue that virtually every challenged statement was inactionable puffery, "opinion," or forward-looking. The notion that the misstatements were mere "puffery" is absurd. Rather, they were specific, measurable, highly material, and oft-repeated assurances that the most important strategic shift in Walgreens' history was "working," "on track" to meet all milestones, and poised to "drive sustainable, long-term, profitable growth" representing "over half" of the Company's EPS growth. Defendants' misstatements were also not inactionable opinions. They concerned Walgreens' actual performance and concealed known, material adverse facts that directly conflicted with what a reasonable investor would take from the statements—including the undisclosed fact that the Company secretly abandoned the clinic rollout less than nine months after announcing it. Nor are Defendants' statements immunized under the statutory safe harbor for certain "forward looking" statements. To the extent any statements had forward-looking aspects, Defendants made them with actual knowledge of their falsity and failed to identify adequate cautionary language, particularly given that the "risks" had already materialized.

As to scienter, the facts are overwhelming. The Individual Defendants emphatically touted VillageMD as Walgreens' "transformational" lifeline. They were hand-picked to implement and

---

[2] *See, e.g.*, DB1 (claiming VillageMD was performing excellent and Walgreens' abandonment of rollout and "exit" of VillageMD investment was merely due to new management's "strategic review"); DB9 (claiming new management's "strategic review" was simply to "simplify" Walgreens' business).

oversee the strategy, they made dozens of statements about it, they had access to a wealth of data and reports showing its abysmal performance, and they internally acknowledged its struggles. Moreover, Defendants obviously knew that the rollout had been abandoned as they were the ones who made that decision—as well as the decision to fire every single employee responsible for building new clinics. Such extraordinary facts are more than sufficient to plead scienter.

Defendants' Motion should be denied in its entirety.

## I. STATEMENT OF FACTS

### A. Desperate for Growth, Defendants Announce Their "Transformational" Strategic Shift To Healthcare By Investing in VillageMD and Rolling Out Full-Service Doctor Offices At Walgreens Stores

For over 120 years, Walgreens never reported an annual loss. ¶35. However, in the run-up to the Class Period, industrywide headwinds increasingly pressured Walgreens' pharmacy and retail sales and profits. ¶¶35-36. While top competitors entered the more lucrative healthcare industry, Walgreens stood on the sidelines and its stock price suffered, declining nearly 50% in the five years before the Class Period. ¶¶37-38. In 2019, facing mounting pressure from investors, Walgreens announced a pilot program to open doctor-staffed, full-service, primary care doctor offices at Walgreens' stores. ¶41. These "co-located" clinics were intended to increase Walgreens' profitability by driving prescription fills, retail sales, and rental income. ¶42. In July 2020, after a reportedly successful Pilot, Walgreens announced a $1 billion investment in VillageMD, a primary care provider, to roll out VillageMD clinics at Walgreens stores nationwide. ¶44. To implement and oversee this change in strategy, Walgreens hired a new executive team, headed by Defendant Brewer as CEO, and Defendant Driscoll as President of U.S. Healthcare. ¶¶44-45, 47-48, 282.

On October 14, 2021, the Class Period's start, Walgreens trumpeted its "transformational" new primary care strategy by announcing it would invest an additional $5.2 billion—nearly three years' worth of the Company's earnings—to acquire a controlling interest in VillageMD. ¶¶51-52.

Defendants touted that Walgreens would be the "first national pharmacy chain to offer full-service primary care practices with primary care physicians and pharmacists co-located at its stores all under one roof at a large scale," and hailed the $5.2 billion investment as accelerating the opening of at least 1,000 of these "co-located" clinics in more than 30 U.S. markets by 2027. ¶202. Moreover, Defendants created a new U.S. Healthcare segment around VillageMD, specified that its margins would be significantly "higher than [WBA's] current business," and represented that VillageMD was "the key to unlock material, enhanced, long-term growth" for Walgreens. ¶¶55, 57. Walgreens' stock price rose 7% on the news and analysts applauded, calling the Company's "major push into healthcare" a "great strategic move" and a "turnaround of epic proportions," while noting that long term growth "will be driven in large part by VillageMD." ¶¶59-61.

**B.     Throughout The Class Period, Defendants Repeatedly—And Falsely—Assure Their "Bold" VillageMD Strategy Was "Working"**

Yet, even as Defendants touted their purportedly "transformational" strategy, Walgreens' internal metrics showed the opposite: that the VillageMD strategy was failing miserably in markets across the country. Multiple CWs, including former employees responsible for overseeing the initial clinic rollout in Arizona—the first post-Pilot market—confirmed that nearly every co-located clinic in the state widely underperformed targets due to doctor and patient shortages.[3] CWs confirmed these same issues plagued the rollout in other markets in 2021, and never improved.[4]

---

[3] *See, e.g.,* ¶¶88, 98 (CW2, VillageMD Exec. Dir. and Market President: opened 30 Ariz. clinics, and "all" underperformed); ¶¶90, 94 (CW3, VillageMD Bus. Development Dir. in Ariz.: 70% "were dismal failures"); ¶91 (CW 4, VillageMD's Dir. of Clinical Ops. in Ariz: provider and patient shortages were "well known" "big problem[s]" as of July 2021, and "nothing changed" by August 2022).

[4] *See, e.g.,* ¶91 (CW 5, WBA Fla. Regional Implementation Team Lead: clinics "not performing up to Walgreens' expectations" from outset); ¶92 (CW 7, VillageMD Senior Dir. of Strategic Growth with visibility into all markets: "obvious" by late 2021 the strategy was failing); *id.* (CW 8, WBA Implementation Team Lead who managed buildouts in Fla., Ga., Ind., Ill., and Tex.: the strategy was flawed and destined to fail in 2021); *id.* (CW 6, VillageMD's Regional Practice Admin. in R.I.: it was clear VillageMD was a "sinking ship" by September 2021); *id.* (CW 9, Dir. of Revenue Cycle Mgmt. for U.S. Healthcare: obvious by late 2021 VillageMD was underperforming).

Despite knowing that Walgreens was not profitably scaling or operating VillageMD clinics, Defendants repeatedly stated the opposite, claiming: "our bold strategy is working," the "Village model works," and "we … are well underway in our transformation." ¶¶79, 82, 237. Defendants buttressed these assurances by: (i) issuing regular press releases touting new VillageMD clinic openings, which they specifically highlighted in Walgreens' SEC filings as a "***key performance indicator***" on which investors should rely "***when analyzing the core operating performance of the Company***"; and (ii) reiterating and raising EPS growth projections for Walgreens and the U.S. Healthcare segment based on the rollout's accelerated pace. ¶¶64-65, 71, 242.

In November 2022, Walgreens injected another $3.5 billion into VillageMD, bringing its total investment to approximately ***$10 billion***. ¶74. Defendants continued issuing a torrent of statements regarding the healthcare-centric strategy's purported success, reassuring that "the Village model works," "we're executing our strategic vision," and "we don't see any challenges to the actual model of what we're delivering for patients and with providers." ¶¶79, 246.

### C. Defendants Knew VillageMD Underperformed In Every Region and Their Strategy Never "Worked," Rendering Their Statements Baseless

In reality, throughout the Class Period, the vast majority of clinics in nearly every market Walgreens entered failed, with virtually ***no*** clinic in ***any*** region meeting Walgreens' targets. CWs within both Walgreens and VillageMD—from regional managers through executives who reported directly to the C-suite—described how the strategy was plagued by severe doctor and patient shortages that existed from the rollout's inception until Walgreens exited the strategy.

More than ***ten*** CWs confirmed that physicians overwhelmingly refused to practice medicine at a Walgreens. For example, a former VillageMD Business Development Director responsible for recruiting physicians for clinics, explained that "***well upwards of 50% of Village clinics [nationwide] had staffing shortages,***" and many clinics were "***never [] able to recruit a***

*doctor.*" ¶¶90, 94-96, 102. One former VillageMD Practice Manager confirmed that Walgreens built out approximately 40 clinics in Arizona, but in reality, *the Company was unable to staff any of them*. ¶99. Similarly, a Regional Implementation Team Lead in Florida described how many "*stores sat empty for months… because doctors were not available*." ¶102. These facts were echoed by CWs across the country.[5] *Eight* CWs also confirmed markedly low patient demand at most clinics nationwide throughout the Class Period.[6] In fact, *doctor and patient shortages were so severe that the vast majority of clinics—approximately 70%—always fell "dismal[ly]" below target*. ¶107, ¶¶90-91, 102 (this was a "big problem" that "never improved.").

Walgreens' healthcare strategy was such a failure that, by June 2022, Defendants secretly shut down the VillageMD clinic rollout. *Eight* CWs explained that, by mid-2022, Walgreens installed its own executive, Mark Vainisi, at VillageMD and tasked him with implementing a "nationwide hold" on new clinic openings, exiting certain markets completely, and slashing costs. ¶¶124-35. *Five* CWs further confirmed that, in mid-2023, Walgreens and VillageMD quietly fired hundreds of employees, *including every single employee responsible for clinic rollout*. ¶¶141-43. And multiple CWs confirmed that, as Walgreens was unable to execute its VillageMD strategy, Defendants sought to "mask their losses" and "cook the books" by causing VillageMD to acquire Summit Health and CityMD, funding $3.5 billion of the purchase price in "a last ditch effort to save the company." ¶¶105, 136-40. But even that scheme failed. *See* ¶¶184-85, 191-92, 196-97.

---

[5] *See e.g.,* ¶86 (CW1, VillageMD Nat'l Medical Dir. and EVP: "serious performance issues at Village," including "finding doctors with patient panels in close proximity to a co-located clinic" or those willing to work in a Walgreens store at all"); ¶97 (CW 4, VillageMD Dir. of Clinical Ops., describing the same); ¶98 (CW2, VillageMD Exec. Dir. and Market Pres.: every clinic he opened underperformed and "the problem was finding providers"); ¶103 (CW 8, WBA Implementation Team Lead, describing same); ¶¶100, 104-06.

[6] *See* ¶107 (CW4, VillageMD Dir. of Clinical Ops., stated the "shortage of patients" was a "big problem"); ¶110 (CW1, VillageMD National Medical Dir. and EVP of VillageMD, described lack of patients); ¶112 (CW 13, WBA VP of Pharmacy and Retail Ops., stated "patients weren't coming to the Walgreens"); ¶¶107, 113-14 (CWs 2,3, 14, 15, 16) (similar); *see also* ¶¶115-22.

**D.      The Truth Gradually Emerges, But Defendants Continue To Mislead Investors**

The truth about VillageMD's colossal failure gradually emerged, causing investors to suffer billions in losses. On June 27, 2023, Walgreens released its Q3 financial results, revealing a $172 million operating loss, and slashed fiscal 2023 guidance due to "a slower profit ramp for U.S. health care," particularly at VillageMD. ¶¶163-65. Nevertheless, Brewer continued to falsely claim "we have the right strategy in place" and are "moving at a pace to deliver long-term shareholder value." ¶257. Two months later, Brewer and Kehoe abruptly "resigned" within the span of roughly a month. ¶¶172, 174. Notably, these resignations were so unusual that analysts wrote that they "***cannot recall a time in our coverage experience where we have seen both the CEO and the CFO depart a large-cap company in such a short span***." ¶176.

In September 2023—over a year after Walgreens secretly stopped the rollout and months after firing the Implementation teams—Defendant Driscoll brazenly reiterated that Walgreens planned to open 600 clinics by 2025 and 1,000 by 2027. ¶260. In October 2023—despite announcing the first annual loss in Walgreens' 123-year history—Driscoll proclaimed that the "VillageMD model works." ¶264. On January 4, 2024, Defendants again announced dismal financial results due to VillageMD's underperformance, but still misstated that VillageMD was on the precipice of "accelerate[d] profitability." ¶¶184-86. Even by March 28, 2024—while announcing a $12.4 billion write down in VillageMD goodwill and the closure of over 70% of the clinics—Defendants still held out the strategy as a success, declaring "[w]e have reached an important milestone delivering our first ever quarter of positive adjusted EBITDA" for U.S. Healthcare "driven" by "VillageMD." ¶¶189-91, 271-72. Ultimately, on June 27, 2024, Wentworth came clean, admitting the VillageMD model was so unsalvageable that Walgreens was forced to jettison the strategy entirely and shutter nearly 2,000 of its U.S. stores to raise cash. ¶¶191-92.

Walgreens suffered such staggering losses from VillageMD that the Company could not

9

continue operating as a public company, and was forced to sell itself to a private equity firm for $10 billion, a fraction of its former value. PX2. In an article titled, "Walgreens Goes From $100 Billion Health Giant to Private-Equity Salvage Project," *The Wall Street Journal* reported the $10 billion price tag was "down a staggering 91% from its $106 billion peak in 2015." PX3. In short, the VillageMD debacle decimated Walgreens and caused billions of dollars in losses to investors.

## II.    ARGUMENT

On a Rule 12(b)(6) motion, courts accept "all well-pleaded facts as true" and draw "all reasonable inferences in the plaintiff's favor." *Rensin v. U.S. Cellular Corp.*, 2024 WL 4651837, at *2 (N.D. Ill. Nov. 1, 2024) (Rowland, J.). Section 10(b) claims must allege a material misrepresentation or omission and scienter, among other elements. *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *2 (N.D. Ill. Sept. 1, 2020). The Motion challenges only these two elements.

### A.    The Complaint Adequately Alleges Material Misstatements and Omissions

A misstatement or omission is actionable where sufficient facts are alleged "to support a reasonable belief as to" its "misleading nature." *Seeks v. Boeing Co.,* 2024 WL 4367846, at *15 (N.D. Ill. Sept. 30, 2024). Statements are materially misleading if "taken together and in context, [they] would have misled a reasonable investor." *SEC v. Kameli*, 2020 WL 2542154, at *25 (N.D. Ill. May 19, 2020). Thus, "statements, even if literally true, could still be misleading." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012). The Complaint amply alleges "what" statements are challenged, "who" made them, "when," "where," "and how" they were made, and "why" they were misleading.[7] *AbbVie*, 2020 WL 5235005 at *2.

---

[7] Far from puzzle pleading (DB11 n.3), the CAC identifies each misstatement, separates them by subject, and states the reasons they are false. *See SEC v. Winemaster*, 529 F. Supp. 3d 880, 907 (N.D. Ill. 2021). Defendants' chart (DB App. A) belies their argument that the misstatements are hard to discern or intermingled with context. DB11 n.3 citing *Conlee v. WMS Indus., Inc.*, 2012 WL 3042498, at *4-5 (N.D. Ill. July 25, 2012) (hard to "discern" statements from context) and *Lauria v. Biosante Pharm., Inc.*, 968 F. Supp. 2d 951, 958 (N.D. Ill. 2013) (same emphasis used for context and misstatements).

10

### 1. Defendants' Assurances that the VillageMD Strategy Was "Working," "Highly Scalable," And "On Track" To Deliver "Over Half" the Company's EPS Growth Were False And Materially Misleading

Throughout the Class Period, Defendants falsely maintained that Walgreens was successfully executing the VillageMD strategy—and did so with specific, present-tense, and wholly-positive statements. For example, Defendants routinely represented that "the village model works," was "highly scalable," and, as a result, Walgreens was "well underway in [] transform[ing] to a consumer-centric healthcare company." ¶¶227, 237, 245, 252.[8] Moreover, on October 13, 2022, in response to an analyst inquiry about difficulty hiring physicians for its clinics, Brewer definitively replied that there was "no impact" and no "labor issue" at "VillageMD." ¶240.[9]

The Complaint is replete with particularized facts alleging these statements were materially false and misleading when made. Twenty-one CWs with firsthand knowledge of the VillageMD rollout painstakingly describe that it was an unbridled disaster from its start due to a perennial lack of doctors and patients. The CWs describe how Walgreens rolled out "too many clinics, too fast," such that it could not hire sufficient doctors to staff the clinics and likewise experienced a severe

---

[8] ¶¶231, 237 ("[o]ur strategy is working to strengthen the business and build a solid foundation for sustainable shareholder value creation," purportedly because Walgreens had "seen good success in terms of [its] initial [VillageMD] investments," "continue[d] to drive strong execution," and "rapidly expand" U.S. Healthcare, and purporting Walgreens was "doubling down" insofar as Defendants "accelerated the investments in 2022" in VillageMD despite the rollout being halted); ¶246 (VillageMD "strategy is working" and "[w]e're executing our strategic vision"), ¶257; ¶¶252, 264 ("the village model works," "we've seen it work with ... some of the legacy businesses," "we're confident, and *we don't see any challenges* to the actual model of what we're delivering for patients and with providers in those markets").

[9] Defendants suggest that by announcing additional clinic openings, Brewer's statement regarding physician growth cannot be misleading. DB18-19. But clinics are not the same as physicians. And, far from conceding clinic growth (DB19), the CAC alleges Walgreens had abandoned the rollout due to lack of doctors and patients by the time Brewer spoke. ¶¶124, 133-35, 240. Defendants further contend that the misstatements cannot be misleading because Kehoe warned of a possible "people risk" regarding doctor count on November 29, 2021. DB19-20. But his warning occurred over a year prior, and when he spoke the "risk" had already materialized. *See Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *8 (D. Nev. Nov. 7, 2013) (stale warning did not immunize more recent and "specific statements"). Finally, Defendants' attempt to construe Driscoll's *prepared remarks* that patient "demand for healthcare services in our stores has never been higher" (¶240) as having "nothing to do with VillageMD" (DB18) inappropriately attempts to resolve competing interpretations "on a motion to dismiss." *Rensin*, 2024 WL 4651837, at *8.

11

lack of patient demand *across virtually every market*, resulting in the *"vast majority"* of VillageMD clinics underperforming *at all times*. ¶¶86, 88-114, 158. Far from "working," VillageMD performed so poorly the rollout was abandoned in June 2022. *See supra* §I.C.

Confronted with such particularized facts, Defendants request a categorical "discount" of all CW allegations. DB23-24. However, the Complaint describes CWs by title, responsibility, location, and tenure; provides their first-hand accounts based on personal work experience; and provides facts that are amply corroborated by other CWs. *Ross*, 2012 WL 5363431, at *5 (crediting CWs described by title, period of employment, and location). Thus, no "discount" is warranted. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*") (CWs credited if allegations "support the probability" CW "in the position" to "possess the information").

Defendants' argument that many of their statements were mere "puffery" (DB14-15) is meritless. Statements such as the VillageMD strategy "is working," is "highly scalable," and is "tracking well against all of our key milestones" are concrete and measurable. CWs directly contradict these "facts" by confirming that the vast majority of clinics nationwide underperformed Walgreens' *own* patient, prescriber, and profitability targets at all times. ¶¶86-92. Further, Defendants' conclusory assertion that their statements were immaterial is undermined by the fact that Defendants themselves explicitly touted VillageMD's central importance to their business and the strategy's purported success in "multiple geographies." ¶212, 252; *see Boeing,* 2024 WL 4367846, at *15 (stating "the airplane is safe," "we know how to fly it safely," and "the 737 MAX is a safe airplane" was actionable and not puffery); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 875, 880 (N.D. Ill. 2011) ("*Allscripts*") (statement that "rollout [was] going very well" actionable); *Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at *3-4 (N.D. Ill. June 14, 2006) (statements touting

anticipated "improvement" while concealing "a near complete disaster" not puffery).

Next, in lumping together these and other highly material statements in a footnote and asserting that all are puffery without any meaningful analysis (DB 14 n.8), Defendants ignore "the context in which the statements were made." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *11 (N.D. Ill. Apr. 18, 2022). With context—that Walgreens was purportedly successful in its "transformational" strategy and creating long-term shareholder value—the notion these statements were immaterial is specious, as a reasonable investor would "find" information concerning the most important strategy in Company history "important." *See Hedick v. The Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (touting activities "ramping up" and "lack of business disruption" not puffery in context of $1.5 billion merger). Courts routinely sustain such statements. *Pubs. Empls.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2018 WL 844420, at * 2 (N.D. Ill. Feb. 12, 2018) (touting integration was "gaining momentum," and had "great progress"); *In re Akorn Sec. Litig.*, 240 F. Supp. 3d 802, 816-17 (N.D. Ill. 2017) (touting company was "on track with [its] plans"). That Defendants made "***over 80 statements***" (DB10) (original emphasis) proves the point. *See TreeHouse Foods*, 2018 WL 844420, *3 (not puffery where defendants made "repeated" statements they were "handling business" "successful[ly]"); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) (similar).

What's more, many of the snippets lumped together in the Motion's footnote 8 are clearly material when read with the full statement, without selective truncation. For example, Driscoll's statement that "the village model works" was made in the very same sentence as his specific assertion that "we've seen it work" in "multiple geographies." ¶252.[10] Similarly, Brewer's

---

[10] Defendants' claim that Rick Gates made these statements (DB26 n.19; ¶252) is contradicted by public transcripts. *Compare* DX. 37 at 9-10 (identifying Gates as the speaker) *with* PX1 at 11-12 (addressing the question to Driscoll and identifying Driscoll as the speaker); *see Rensin*, 2024 WL 4651837, at *7 n.5 (declining to credit defendants' contrary interpretation).

13

assurance that Walgreens was "well underway in our transformation to a consumer-centric healthcare company" was made immediately after she claimed Walgreens "delivered ahead of our expectations in fiscal year '22," and right before she specified that Walgreens was rapidly "scaling U.S. healthcare" and "raising long-term sales targets with a clear path to achieve profitability starting in fiscal year '24." ¶237; *see Fryman*, 2022 WL 1136577, at *20 (rejecting defendants' attempt to lump together "snippet[s]" of statements and ignore surrounding text).

Further, certain of these statements directly responded to analyst's questions, who routinely seized upon the statements' significance and repeated them positively in reports to investors. ¶¶61, 70, 80, 179, 182, 240; *see Boeing,* 2024 WL 4367846, at *15-16 (positive analyst reaction "bolsters" materiality, distinguishing *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622 (N.D. Ill. 2020) (DB15)); *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *5 n.1 (N.D. Ill. Feb. 10, 2023) (response to analyst goes "well beyond puffery").

For all of these reasons and more,[11] there is no doubt that the statements Defendants say are puffery "altered the total mix of information" available to investors. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (defining standard for materiality).

### 2. Touting VillageMD Clinic "Openings" Was Materially Misleading[12]

Defendants materially misrepresented an escalating number of "open" and "operating" clinics staffed with "physicians." *E.g.,* ¶¶202, 212, 223. Indeed, Defendants emphatically

---

[11] Yet another reason supporting materiality is Defendants' knowledge that the strategy did not work in any market at any point in the Class Period, and all internal metrics pointed to it being an enormously expensive flop. *See Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 476 (N.D. Ill. 2021) (statements actionable where "defendants communicated a narrative of improvement rather than disclosing … adverse trends"). Moreover, it is inappropriate to determine materiality "at the summary judgment stage, let alone on a motion to dismiss." *Allison*, 2023 WL 1928119, at *8; *see also In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004) (rejecting puffery defense because weighing materiality requires "delicate assessments" of competing factual inferences that are "peculiarly ones for the trier of fact").

[12] Defendants do not argue that the clinic opening statements are forward-looking, puffery, or opinions (excepting the KPI statements in ¶236, which they contend is an inactionable opinion). *See* DB11-16.

14

highlighted this metric in Walgreens' SEC filings as a "***key performance indicator***" that investors should rely on when evaluating the Company's "operating performance" (¶236 & n.28). This number purportedly surged throughout the Class Period,[13] and Defendants touted "the "accelerated" "pace" of new openings as a barometer of the rollout's success. ¶¶216, 219, 227.

These statements are actionable as they created a material misimpression that the clinic rollout and healthcare strategy were proceeding smoothly and successfully, when in reality the vast majority of clinics in every region were dramatically underperforming Walgreens' targets due to a pervasive shortage of doctors and patients. *Kelsey v. Allin*, 2016 WL 825236, *4 (N.D. Ill. Mar. 2, 2016) (misleading to present "impression of a state of affairs" differing from reality). The issues were so severe that by June 2022, Walgreens' most senior executive officers secretly decided to shut the rollout down, close clinics, and institute drastic cost cutting. *See* §I.C. Thus, raw clinic counts were decidedly ***not*** a "key performance indicator" evidencing the strategy's success, and it was materially misleading for Defendants to hold them out as such. ¶236 & n.28.

Defendants' reliance on extraneous exhibits to argue clinic opening figures were accurate (*see* DB17) is both improper and irrelevant.[14] Plaintiffs contend that it was materially misleading for Defendants to claim that raw clinic counts were a "key performance indicator" demonstrating the purported success of the program when in reality the opposite was true: "well upwards of 50%" of the clinics had such severe staffing shortages that they often "sat empty for months." ¶102. Moreover, by stating co-locations were "open" and "operating physician clinics," while equating raw clinic counts with successful scaling and performance, Defendants created a duty to disclose

---

[13] ¶¶215, 216, 226-27, 230-31, 236, 245-46, 251.

[14] Defendants concede that three of these documents are not cited in the CAC (*compare* DB3 n.1 *with* DXS 15, 23, 27) and the other contains false statements (*compare* ¶236 n.28 *with* DX 38); *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018) (judicial notice improper where there is a "reasonable dispute as to what the [document] establishes").

that clinics were not fully operating and were significantly underperforming targets.[15] *Macquarie Infrastructure Corp. v. Moab Partners*, L.P., 601 U.S. 257, 258 (2024) ("half-truths" are actionable); *see also Allison*, 2023 WL 1928119, *5-6 (touting a "fleet of over 100 green vans" to provide patient transport created "misleading impression" where defendants omitted illegal patient acquisition tactics); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229-230 (S.D.N.Y. 2008) (store openings materially misleading where they omitted "problems and delays in store redesigns"). Defendants exacerbated this materially false impression by concurrently touting that the "VillageMD model works," that "we know how to scale their model," and that Defendants had "proof" that the strategy could be profitably scaled at a rapid pace. *See Groupon*, 553 F. Supp. at 476 (statements actionably false when part of a misleading "narrative").

Finally, by choosing to tout new clinic openings after June 2022, Defendants were clearly obligated to disclose the extraordinarily material fact that Walgreens had already decided to abandon the rollout. *Macquarie*, 601 U.S. at 258; *Holwill*, 2020 WL 5235005, at *3.[16] Defendants' June 2023 disclosures that Walgreens "slowed the pace of clinic openings in new markets" and was experiencing "slowness at building patient panels," and their October 2023 disclosure that the Company had "essentially stopped" opening new clinics (DB8, DB21, DB25), were not only belated—***coming 12 and 18 months, respectively, after Walgreens internally abandoned the***

---

[15] ¶¶202, 212, 216, 219, 223, 226-27, 230-231, 236, 245-46, 251, 257. Similarly, claiming clinic counts "had nothing to do" with doctor and patient shortages fails. DB17-18 (citing *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *6-7 (N.D. Ill. Sept. 30, 2024) ("general business performance" created no duty to amend "outlook"), *Anderson v. Abott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. Jan. 25, 2001) (financial statements not false for failure to disclose regulatory actions), and *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (financial statements not false for omitting defective product sales)).

[16] Because the CAC does not allege any pure omissions, Defendants' case law is inapt. *See* DB21-22 (citing *Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022) (rejecting "general duty to disclose [an] investigation") and *Teamsters Affiliates Pension Plan & Int'l Brotherhood of Teamsters General Fund and Retirement and Protection Plan v. Walgreens Co.*, No. 08-C-2162, at 2–3 (N.D. Ill. Sept. 24, 2009) (no duty to disclose future profitability impacts where company did not issue guidance, only accurate historical performance)).

16

*rollout*—but do not come close to apprising investors that the rollout had already been ***abandoned***. *See In re NeoPharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003) (fraudulent where defendants knew and did "not disclos[e] the serious extent and nature of the problems").

### 3.    Touting Guidance and Milestones Was Materially Misleading

Defendants materially misrepresented Walgreens' ability to profitably scale VillageMD's business model, which was necessary to achieve financial guidance and rollout milestones. For instance, Defendants touted that VillageMD's "growth potential" and "high-growth trajectory" would lead to profitability, including significant EPS growth. *See* ¶206 (11-13% adjusted EPS growth by FY24, 7% attributed to U.S. Healthcare; 18% adjusted EPS growth by FY25); ¶219 (VillageMD "execution" would "accelerate WBA's EPS growth to low teens" by FY2024). As CWs confirmed, the majority of clinics nationwide underperformed operational plans and missed profitability targets. *See* §I.C, *supra*. Thus, Defendants' guidance, and statements that Walgreens was "on track" and "well on the way" to meet targets, are actionable because they lacked a reasonable basis when made. *See Hedick*, 2021 WL 3566602, at *5 (claiming performance "in line" "on track" "going very well" and defendant "had every confidence" misleading where no basis) (collecting cases); *Akorn*, 240 F. Supp. 3d at 817 (claiming presently "on track" actionable).

Moreover, as the Class Period progressed, VillageMD's dismal performance never improved and Walgreens abandoned its plan to roll out over 1,000 clinics. Yet, even after halting the rollout, Defendants continued issuing bullish clinic-opening milestone projections and linking clinic openings to Walgreens' future profitability. For instance, on October 13, 2022, based on purported strategy "execution" and "significant tailwind" provided by "VillageMD," Defendants claimed "visibility" and "confidence" that U.S. Healthcare was Walgreens' "next growth engine" representing "over half of [Walgreens'] annual adjusted EPS growth." ¶242. But Defendants had already decided to ***abandon*** the rollout and close clinics three months earlier.

On September 21, 2023—months after firing every employee responsible for building clinics (100+ people) and less than one month before admitting Walgreens "essentially stopped" opening new clinics—Defendant Driscoll was asked whether Walgreens' milestones still included opening 600 and 1,000 co-locations by 2025 and 2027, respectively. ¶260. In response, Driscoll falsely replied "Yes"—a blatant lie.[17] Because Defendants lacked a basis for their projections and milestones given the available data, their statements are actionable. *See Groupon*, 553 F. Supp. 3d at 483 (guidance actionable where omitting "severity of [] troubles" not adjusted "even though [defendants] had knowledge that seriously undermined [forecasts'] accuracy"); *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *11 (N.D. Ill. Apr. 26, 2021) (projections actionable where "it is hard to imagine [defendants] did not know" severe issues with key growth driver).

Defendants contend that their statements cannot be misleading because investors understood from certain disclosures that clinics could lose money. DB19-20. However, disclosing that Walgreens was in "investment mode" does not alert investors to the fundamental obstacles then-plaguing clinics in every region, which never improved and made the targets unattainable. *See Hedick,* 2021 WL 3566602, at *21. Defendants also contend their statements are not misleading because Walgreens purportedly met certain targets. *See* DB14, 18. But the mere fact that Walgreens "opened" 200 VillageMD clinics was meaningless given that those clinics utterly lacked the staff necessary to operate them, and were performing abysmally. Put simply, empty clinics do not generate profits. Further, U.S. Healthcare's profitability was not driven by VillageMD's growth, as Defendants claimed on March 28, 2024, but rather by abandoning the rollout, shuttering clinics, instituting mass layoffs and cost-cutting measures, and spending $3.5

---

[17] Because Defendants concealed the rollout's true state from investors, Defendants' reliance on *Goucher v. Iterum Therapeutics plc*, 648 F. Supp. 3d 962, 972 (N.D. Ill. 2022) (DB14), where the allegedly concealed information was disclosed or publicly available, is inapt.

billion to acquire the **already** profitable Summit. Notably, one quarter later, Walgreens missed guidance and disclosed it was jettisoning VillageMD. ¶¶191-92.

### 4. Defendants' Medicaid Statements Were Materially Misleading

Defendants falsely stated (eleven times throughout the Class Period) that VillageMD "focused on all patient populations" and accepted "all types of insurance," including "Medicaid," which Defendants admitted was "very important" and "a primary reason" for the partnership since it would generate an uplift in Walgreens' pharmacy prescription fills. ¶¶42, 208 & n.27. Their statements were false when made because, as multiple CWs confirmed, "VillageMD did not accept Medicaid. Period." [18] ¶¶116, 121-22; *Ross*, 2012 WL 5363431, at *5.

### 5. Defendants' Opinion Statements Are Actionable

An opinion is actionable where, *inter alia*, it "omits material facts about the issuer's inquiry into or knowledge" and "those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Defendants contend their "key performance indicator" statements are inactionable opinions. DB16, 20; ¶236 & n. 28. Not so. Defendants stated the KPIs were a highly material fact and the most important criteria for investors to evaluate. Indeed, in the Company's SEC filings throughout the Class Period, Defendants themselves specifically urged investors to rely on this very metric "when analyzing the core operating performance of the Company." Accordingly, if deemed an opinion, the KPI statements were false because Defendants omitted

---

[18] The Medicaid statements are not challenged as forward-looking, opinions, or puffery. *See* DB11-16. Instead, Defendants improperly seek an interpretation that the phrase "in participating markets" (found only in some Walgreens' press releases) informed investors that Medicaid was not accepted in "all markets." DB20. Defendants cannot retroactively insert this language where it was not originally. *See* Appx. at Nos. 5, 33. Moreover, a reasonable interpretation of "in participating markets," which must be credited at this stage, *Rensin*, 2024 WL 4651837, at *8, is that VillageMD accepted Medicaid in any geographic region Medicaid ordinarily participated—a point the CWs categorically refute.

contradictory facts, including that these statements were made after Walgreens abandoned the rollout and Brewer and Kehoe internally acknowledged that VillageMD was "struggling, underperforming, and not meeting targets." [19] ¶¶134, 145; s*ee Fryman*, 2022 WL 1136577, at *9 (opinions actionable where omitted significant problems); *Allison,* 2023 WL 1928119, *7 (same).

Likewise, Mahajan's assurances that "we're moving in the right direction as it relates to where the fiscal year is" (¶269) and "we expect to continue to drive growth as they focus on the core markets" (¶272) actionably omitted that VillageMD underperformed targets by ***billions*** of dollars due to physician and patient shortages. In fact, as partially revealed on March 28, 2024—mere months after Mahajan's statements—Walgreens instituted more clinic closures and a $12.4 billion write down.[20] ¶¶188-90; *see Azar v. Grubhub, Inc.*, 2021 WL 4077327, at *5 (N.D. Ill. Sept. 7, 2021) (opinion in context "could reasonably be interpreted as a factual claim"); *see In re Advance Auto Parts, Inc.*, 2020 WL 599543, *4 (D. Del. Feb. 7, 2020) ("opinion" on planned "sales growth" actionable where sales were "down, nationwide" and "consistently missing" targets).

### 6. The Safe Harbor Provides No Protection

***Defendants' Knowledge Precludes Safe Harbor***: The safe harbor is inapplicable to Defendants' milestone and guidance misstatements because Defendants had actual knowledge (*see* §II.B.1) that the challenged statements were false and misleading, and lacked a reasonable basis when made. *See Rensin*, 2024 WL 4651837, at *11 (actual knowledge precluded safe harbor); *Selbst v. McDonald's Corp.*, 2005 WL 2319936, at *19-22 (N.D. Ill. Sept. 21, 2005). The decision

---

[19] *Compare Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.,* 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) (DB16) (opinion Caterpillar was "complying with the law" and "cooperating with the government" was "put in context" by accompanying disclosures of an IRS examination and Grand Jury subpoena) *with* ¶103 (KPI statement unaccompanied by disclosure that the rollout was stopped or that though clinics built, "there was nobody to run them" so they "sat empty for months.").

[20] Defendants had access to contradictory data and would imminently announce billions in losses, unlike in *Chew*, 2024 WL 4346522, at *12 (DB16), which involved "reach[ing] those conclusions in 2018—long after defendants made the disputed statements," and were insufficient to show statements false when made.

to stop the rollout in June 2022 further evidences Defendants' actual knowledge of the fundamental obstacles and, given the shutdown and clinic closures, that clinic count and guidance goals were unattainable. *See Pierrelouis*, 2021 WL 1608342, at *11 (when taking allegations as true, knowledge was plausible); *In re Next Level Systems, Inc.*, 1999 WL 387446, at *7 (N.D. Ill. Mar. 31, 1999) (omissions "undermining the accuracy of [a] forecast" not protected).

*Defendants' Boilerplate "Cautionary Language" is Not Meaningful*: The safe harbor is also inapplicable because the challenged statements were not accompanied by "meaningful cautionary" language, as the risks had already materialized. 15 U.S.C. § 78u-5(c)(1)(A). Defendants cautioned that U.S. Healthcare's acquisitions "*could* experience losses" and general market conditions "*may* cause actual results to differ," at a time when Defendants knew VillageMD's severe underperformance was already causing heavy losses. *See Hedick,* 2021 WL 3566602, at *16 (generic risk disclosures insufficient when the risk has already materialized). Defendants' warnings were also not meaningful because they warned of general risks applicable to any business, while omitting the highly material facts that clinics were unopened, woefully understaffed, bereft of patients, and severely underperforming.[21] *See Pierrelouis*, 2021 WL 1608342, at *11 (simply "highlight[ing]" general risks of the business not meaningful).

*Defendants' Milestone and Guidance Statements Are Not Forward-Looking or Are "Mixed":* These misstatements are not forward-looking (DB11-12), but rather "mix[ed]" with present aspects "not entitled" to protection. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"); *Hedick*, 2021 WL 3566602, at *15. Indeed, Defendants

---

[21] Weighing "meaningful[ness]" is fact-intensive and "difficult if not impossible" to decide "at the pleading stage." *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729, 734 (7th Cir. 2004), as amended (Sept. 3, 2004). Defendants' cases are distinguishable because, unlike here, the warnings were company-specific and relevant to the falsity analysis. *See* DB13 citing *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 838-40, 844-47 (N.D. Ill. 2003) (energy generation specific warnings going to falsity); *In re Midway Games Sec. Litig.*, 332 F. Supp. 2d 1152, 1166 (N.D. Ill. 2004) (plaintiff did not address "highly specific" warnings).

21

misleadingly touted their present ability to achieve milestones by citing the number of clinics that Walgreens had "opened." *See, e.g.*, ¶227 (with 94 co-located clinics, WBA was "on the track," including 200 by 2022 end).[22] These present-tense statements were misleading (*see* §I.A.2), and Defendants lacked any basis to suggest Walgreens could meet its targets. *TreeHouse*, 2018 WL 844420, at *3 ("on track" not forward looking where it gave "false reassurances about present company conditions"); *In re Golden Heaven Grp. Hldgs. Ltd. Sec. Litig.*, 2025 WL 714171, *6 (C.D. Cal. Mar. 3, 2025) (claiming "current conditions will continue" actionable).[23] Defendants' guidance statements were also mixed with historical information learned during the rollout.[24] Defendants are liable if, like here, they "ignored facts seriously undermining" their projections' accuracy. *Hedick*, 2021 WL 3566602, at *15.[25] Moreover, purportedly forward-looking statements were misleading by omission, and "it is axiomatic that the failure to make a statement cannot be forward-looking." *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 974 (N.D. Ill. 2006).

**B.      The Complaint Adequately Alleges Scienter**

Scienter is adequately alleged by pleading the defendant "knew the statement was false [or misleading] or was reckless in disregarding a substantial risk that it was false [or misleading]." *Rensin*, 2024 WL 4651837, at *10. Courts must analyze scienter allegations "holistically," and may not "scrutinize" individual allegations "in isolation." *Tellabs, Inc. v. Makor Issues & Rts.,*

---

[22] *See* ¶¶226, 231, 236 (similar); ¶237 ("instead of 160 clinics in calendar '22, we've gone to 200").

[23] Unlike the "on track" statements in *Phoenix* which only presented "amorphous" confidence, the statements here "communicate [] concrete, verifiable present-state condition[s]" of the status of the rollout. *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 880 (N.D. Ill. 2023).

[24] *See* ¶219 (WBA "well on the way to," targets which "will … accelerate WBA's EPS growth"), ¶242 ("execution to date provides us visibility and confidence to" reconfirm guidance), and ¶267 ("We are making progress to accelerate profitability"); ¶¶206, 264, 271-72 (similar).

[25] Here, unlike in *Motorola* where plaintiff alleged purely forward-looking projections that were merely "inaccurate," Plaintiffs allege mixed statements regarding growth rates and profitability were bereft of any reasonable basis and were predicated on material omissions. *See* DB12 citing *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932 at *9 (N.D. Ill. Feb. 28, 2011).

22

*Ltd.*, 551 U.S. 308, 326 (2007) ("*Tellabs II*"). A culpable scienter inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Rather, it need only be "cogent and at least as compelling as any opposing … one." *Id*. Facts supporting scienter can be direct or circumstantial. *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 850 (N.D. Ill. 2017). A "tie goes to the plaintiff." *Fryman*, 2022 WL 1136577, at *21, *29-*30.

The Complaint is replete with facts that, taken together, support a strong scienter inference.

### 1.    The Complaint Alleges A Strong Inference Of Scienter

*First*, Defendants' statements established they were intimately familiar with VillageMD, the rollout, and the performance of its clinics. Defendants provided regular and detailed updates on the strategy's progress to investors, including in response to specific questions by analysts, and expressly assured investors that management had evaluated the underlying metrics. For instance, Defendants disclosed each time VillageMD entered a new market and provided specific store counts, while repeatedly stating that Walgreens was "poised for explosive growth" because the rollout was "on track" and "the village model works" with "proof that we can execute at pace." ¶¶56, 63, 66, 79, 86, 212, 286. Indeed, that Defendants repeatedly told investors to use clinic counts as a KPI when evaluating Company performance and expressly confirmed management "ha[d] evaluated" these metrics ***alone*** establishes that VillageMD was critical to management and that Defendants were aware of the clinics' performance. ¶¶71, 236 n.28. Defendants also repeatedly responded to analysts' questions about the rollout and strategic healthcare shift, including with specific answers concerning performance in "every one of our clinics" or VillageMD's total lack of "a labor issue." *See, e.g.,* ¶¶179, 182, 237, 240. In sum, scienter is strongly supported here because Defendants regularly "held themselves out as knowledgeable regarding" VillageMD's performance to investors. *Rensin*, 2024 WL 4651837, at *11; *Hedick*, 2021 WL 3566602, at *13 ("repeated references" to an issue shows defendants "made it [their]

23

business to look into" it); *Azar*, 2021 WL 4077327, at *5 (scienter where defendants "were directly involved in … expansion, and made numerous statements regarding" the same).

*Second*, Defendants' own actions demonstrate their scienter. Defendants obviously knew the rollout was shut down in June 2022 because they **ordered** it. Similarly, Defendants fired all 100+ employees involved in opening clinics by June 2023—such massive layoffs could only have occurred with their express authorization. *See Pierrelouis*, 2021 WL 1608342, at *5 (scienter where the problem "was so obvious that [Defendants] must have been aware of it"); *In re Ulta Salon Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1197 (N.D. Ill. 2009) (rejecting defendants "were essentially clueless as to the major problems").

*Third*, Defendants accessed contradictory data, received regular reports, and frequently discussed VillageMD's perennially poor performance. Multiple CWs confirmed Walgreens' executive management—including Brewer and Driscoll who were specifically hired to oversee Walgreens' shift to healthcare (¶¶47, 282), and Wentworth and Mahajan who specifically oversaw narrowing the strategy's "focus" to the "highest opportunity markets" (¶¶180-81, 185-86)— closely tracked daily clinic performance metrics via sophisticated software that Walgreens shared with VillageMD.[26] Brewer, Driscoll, and Mahajan also received regular reports on clinic performance as VillageMD directors. ¶¶277-78, n.29. These metrics and reports would have evidenced that virtually every clinic in every region was underperforming Walgreen's targets.[27]

---

[26] *See* ¶160 (CW9, U.S. Healthcare's CFO's direct report stated Brewer and Kehoe tracked VillageMD metrics through Athena); ¶¶157-59 (CW13, WBA VP Pharmacy and Retail Ops., stated "Walgreens was closely watching how every single site" performed, had "very precise" software for tracking performance, and executives knew they were not meeting targets); ¶161 (CW18, a WBA District Manager, and CW21, VillageMD VP Process Improvement, confirmed Defendants had access to VillageMD's metrics).

[27] Defendants claim the CAC's scienter allegations for Wentworth and Mahajan only repeat falsity allegations. DB26-27. Not so. *See* §II.B.1. Moreover, as Wentworth and Mahajan assured Walgreens was (i) not abandoning VillageMD, (ii) "making progress to accelerate" VillageMD profitability, and (iii)

*See Rensin*, 2024 WL 4651837, *11 ("ongoing monitorship of various metrics" and "receipt of reports of [KPIs]" support scienter); *Azar*, 2021 WL 4077327, at *5 (defendants' "ability to monitor [ ] and analyze trends" supported scienter); *Ross*, 2012 WL 5363431, at *10 (scienter where executives were "hired for the express purpose of" "fixing" problems).

Further, Walgreens' and VillageMD's senior executives routinely met and discussed the clinic rollout and performance. ¶¶144-55. For instance, Brewer, Kehoe, Driscoll, and other C-suite executives met at monthly and quarterly meetings with VillageMD's Chief Physician Executive, Dr. Hatfield, and other VillageMD C-suite executives and discussed "in great detail" the significant problems with the rollout.[28] In addition, Kehoe and Brewer frankly acknowledged at an "all-hands" meeting in shortly before September 2022 that VillageMD was "struggling, underperforming, and not meeting targets." ¶145; *see Rensin*, 2024 WL 4651837, *11 (scienter supported by "discussion of [KPIs] at Business Review meetings"); *Ross*, 2012 WL 5363431, at *9 (scienter where concealed facts "were widely and regularly discussed on weekly conference calls").

*Fourth*, Walgreens pinned its entire long-term growth plan on the strategy, investing over $10 billion on the "transformational" pivot to healthcare. *See* ¶¶36-61, 277. The strategy was so critical that Walgreens reorganized into three segments, with VillageMD as the centerpiece of a new U.S. Healthcare segment. ¶¶51-52. Brewer, Kehoe, and the other Defendants "at the top of the corporate pyramid" knew about VillageMD's performance given their relentless promotion of

---

"getting to a place" where VillageMD would "be meaningfully growing and profitable," they knew but concealed that Walgreens abandoned the initiative, fired all 100+ employees responsible for opening new clinics, and was set to announce the worst results in Company history. ¶¶186, 267, 281. It is "almost inconceivable" Wentworth (CEO) and Mahajan (SVP) were unaware of this. *See Carpenters Pension Tr. Fund for Northern California v. The Allstate Corp.*, 2018 WL 1071442, at *5-6 (N.D. Ill. Feb. 27, 2018).

[28] ¶152 (CW12, VillageMD National Medical Dir., who personally discussed VillageMD's "struggles" with Driscoll); ¶153 (CW13, Walgreens VP of Pharmacy and Retail Ops., describing regular meetings between high level executives of Walgreens and VillageMD); and ¶146 (Regional Implementation Team Lead, CW 5, describing regular conference calls regarding rollout).

the strategy as the "next growth engine" that was already "working to strengthen the business and build a solid foundation for sustainable shareholder value creation" and the "key" for Walgreens to "unlock material … long-term growth." ¶¶51-52, 54-56, 65-67, 280; *see Tellabs III*, 513 F.3d at 711; *see also Flynn v. Exelon Corp.*, 2021 WL 1561712, at *10 (N.D. Ill. Apr. 21, 2021) (collecting cases finding scienter "because it is reasonable to assume top management [was] aware of matters central to that business's operation").

Moreover, the billions in losses that Walgreens incurred from the VillageMD flop— including the first annual loss in Walgreen's 123-year history ($3.1 billion in FY23) and eventual $12.4 billion write down (¶¶14, 35, 189-90, 281)—make it inconceivable that the Individual Defendants were ignorant of the severe and chronic issues that doomed the strategy in every market. *See Tellabs III*, 513 F.3d at 704 ("knowledge is inferable from gravity"); *Ross,* 2012 WL 5363431, at *9 (scienter based on "magnitude of defendants' alleged fraud"). The losses' enormity "supports an inference that [VillageMD's failure] was not a sudden, unexpected event, but rather the result of ongoing problems" that Defendants knew about. *Hedick*, 2021 WL 3566602, at *13.

*Finally*, as the truth began to emerge, Brewer and Kehoe—the top executives responsible for the strategy's success—abruptly "resigned" within weeks of each other, without explanation or planned replacements. ¶¶172-73, 289-91. Driscoll—the senior executive hired to lead U.S. Healthcare—followed suit after only a year in the position, transitioning to a "senior advisory role." ¶292. Analysts were alarmed and immediately connected the departures to Walgreens' healthcare shift. ¶176. Indeed, Deutsche Bank could not "recall a time… where we have seen both the CEO and the CFO depart a large-cap company in such a short span where there were no other

issues at the company." *Id.* These facts add to the scienter inference.[29] *Chow v. Archer-Daniels-Midland Co.,* 2025 WL 790854, at \*4 (N.D. Ill. Mar. 12, 2025) ("*ADM*") (multiple executive departures as truth emerged supported scienter); *Ross*, 2012 WL 5363431, at \*10 (similar).

## 2. Defendants' Attempt To Refute Scienter Fails

Defendants contend that scienter turns on actual knowledge (DB23), but "specific reports, conversations, or meetings demonstrating" actual knowledge are not required. *Allison*, 2023 WL 1928119, at \*9-10. Yet, Plaintiffs *do* allege Defendants' knowledge directly and circumstantially.[30] *See* §II.B.1; *ADM,* 2025 WL 790854, at \*3 ("circumstantial evidence" of knowledge sufficient). These allegations are bolstered by contemporaneous admissions that "management has evaluated" rollout KPIs, and Brewer's and Kehoe's internal knowledge that VillageMD was "struggling, underperforming, and not meeting targets." ¶¶71, 145, 236 n.28; *see Shupe v. Rocket Cos., Inc.*, 660 F. Supp. 3d 647, 678 (E.D. Mich. Mar. 8, 2023) ("monitoring [KPIs] infers scienter"). Defendants seek more, but no "smoking-gun" is required. *Tellabs II*, 551 U.S. at 324.

Remarkably, Defendants attempt to minimize the healthcare strategy's importance (DB27-28), arguing that "Walgreens' core business has long been retail pharmacy" and VillageMD was a "comparatively small [part of] U.S. Healthcare business." Nonsense. *See* ¶63 ("VillageMD is the

---

[29] Defendants' cases are inapt. DB29 (citing *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at \*20 (N.D. Ill. Jan. 12, 2021) (involving a non-defendant who resigned prior to the truth's disclosure, unlike the CEO, CFO, and U.S. Healthcare President here who departed following a partial disclosure), *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 803 n. 14 (N.D. Ill. 2007) (DB29) (plaintiff cited no case law).

[30] Thus, the CAC alleges more than mere access to information, and Defendants' authorities (DB26) are inapt. *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589 (7th Cir. 2019), involved a single paragraph alleging information the defendant received during a deposition. Defendants' reliance on *Allscripts* is perplexing as, like here, scienter was pled because "the context of the entire complaint," included "monthly meetings" where implementation difficulties were discussed. *Allscripts*, 778 F. Supp. 2d at 885. *Gogo* is also inapt because plaintiffs there alleged only that defendants "had to be monitoring the data," not that they did. *See Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1175 (N.D. Ill. 2019). Here, the CAC alleges management evaluated VillageMD metrics through analytical software, reports, meetings, seats on VillageMD's board—and admitted as much internally and in SEC filings. ¶¶71, 145, 152, 157-60.

most significant"). Walgreens invested nearly $10 billion and pinned its entire long-term growth plan on the strategy, reorganized the Company around it, hired new management to both implement it and wind it down, repeatedly touted that it was the "next growth engine" and the "key" to "unlock material … long-term growth," and that it would account for "over half" of Walgreens' entire annual EPS growth in less than three years. These extraordinary facts support scienter. *ADM*, 2025 WL 790854, at *4 (scienter where segment was "at the core of [company's] growth plan"); *Allison*, 2023 WL 1928119, at *9-10 (scienter where operation, though "less than 10%" of the company, was "critical"). Moreover, the VillageMD strategy was so critical that its failure resulted in Walgreens' first annual loss and Walgreens' demise as a public company. [31] *Azar*, 2021 WL 4077327, at *5 (scienter where "negative trends" so severe the company "became unprofitable and reversed its long-standing business model"); *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009) (scienter where "the company's very survival was at stake").

Finally, there is no *per se* requirement (DB24-25) that CWs must have direct contact with the Individual Defendants for CW accounts to be credited. *See Tellabs I*, 437 F.3d at 596. To argue otherwise "is contrary to law." *Avon*, 2019 WL 6115349, at *21.[32] Here, the CWs are reliable and appropriately credited because they were in positions to know the information attributed to them based on their titles, tenures, and responsibilities (all identified in the CAC) and their accounts are

---

[31] Defendants assert the CAC does not allege they "personally benefited" from their fraud (DB30 n.22), but a personal benefit is not required to allege scienter. *Tellabs II*, 551 U.S. at 325. Where, as here, the CAC's "other allegations provide a strong basis to infer intent, there is little if any significance attributable to the absence of" personal motive allegations. *Ross*, 2021 WL 5363431, at *11.

[32] Courts routinely find scienter where CWs lacked direct contact with executive defendants. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (CWs supported scienter even without "direct contact with the defendants"); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 2020 WL 4547217, at *5 (S.D.N.Y. Aug. 6, 2020) (crediting allegations of CW who had no interaction with defendants and who worked at an entirely different company).

consistent and cross-corroborating.[33] *See Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662-63 (N.D. Ill. 2021) (crediting CWs who "provide[d] detailed, firsthand accounts"); *City of Sterling Heights Gen. Emples. Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at \*17 (N.D. Ill. Feb. 13, 2013) (CWs credited where titles, tenures, and responsibilities were identified and their accounts "corroborate[d] and particularize[d]" other allegations).

Defendants' suggestion that VillageMD CWs should be categorically disregarded (DB24 n.16, 25-26) is also meritless. VillageMD is not some third-party Walgreens held at arm's length. Walgreens was the majority owner of VillageMD, controlled its strategy, and the Companies' employees interfaced at every level from the clinic to the C-suite—including in-person meetings, conference calls, and over software. Many of the VillageMD CWs were ***physically located*** at Walgreens stores. Finally, VillageMD CWs (like Walgreens CWs) uniformly describe conditions diametrically opposed to Defendants' statements. *See Golden Heaven*, 2025 WL 714171, at \*7 (scienter based on "broad chasm between statements" and "reported reality"). Defendants' cases are nothing like this.[34]

### 3. Defendants Fail to Proffer a More Compelling Inference

Defendants claim it "makes no sense" that Walgreens would invest $10 billion on a strategy they "***knew*** was bound to fail[]" and proffer that Walgreens "made a significant bet on a new corporate strategy" that "did not pan out." DB1-2, 29-30. This post-hoc inference distorts the Complaint's actual allegations that Defendants, amid intense market pressure and faced with no other viable option, invested billions in VillageMD in hopes that the pivot to healthcare would

---

[33] That CWs 6 and 14 left prior to the Class Period (DB25) is irrelevant. *See Rensin*, 2024 WL 4651837, at \*3 n.1 (crediting pre-class period CW facts) *and Lowry*, 532 F. Supp. 3d at 662-63 (same). Unlike in *Davis v. SPSS, Inc.*, 431 F. Supp. 2d 823, 831 (N.D. Ill. 2006) (DB25 n.17) where the CW spoke with former colleagues after leaving the company, CW12 recounted his personal observations. ¶¶147, 152.

[34] In both *In re Supreme Indus., Inc. Sec. Litig.*, 2018 WL 2364931, at \*10 (N.D. Ind. May 23, 2018) and *Garden City Emps.' Ret. Sys. v. Anixter Intern., Inc.,* 2011 WL 1303387 (N.D. Ill. Mar. 31, 2011), cited at DB23, the courts found scienter lacking where defendants disclosed facts consistent with CW allegations.

revitalize the Company. When the rollout failed to deliver, Defendants made wholly-positive statements about the strategy that lacked a reasonable basis when made, while obscuring their efforts to right-size and change course by stopping the rollout and acquiring Summit. *See Azar*, 2021 WL 4077327, at *6 (rejecting defendants "sincerely believed that their strategic investments would pay off"); *Hedick*, 2021 WL 3566602, at *14 (similar); *Pierrelouis*, 2021 WL 1608342, at *8 (similar).

Viewed holistically, the more compelling inference is that Defendants, bowing to market pressure to jumpstart the Company's declining business, reverse its flagging stock price, and catch-up with competitors, went all-in on a "bold" new healthcare strategy. Meanwhile, Defendants knew or recklessly disregarded that Walgreens was opening "too many clinics, too fast," while wholly lacking sufficient doctors or patients. As performance never materialized and costs soared, Defendants shut the rollout down, closed clinics, and acquired larger companies with profits concealing (temporarily) the severity of VillageMD's problems. These actions are consistent with Defendants taking a gamble that they could cover up damning information until they found a way to make their primary care model work. It is well settled that "concealing bad news in the hope that it will be overtaken by good news" constitutes fraud. *Tellabs III*, 513 F.3d at 710 (Posner, J.); *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022).[35]

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[36]

---

[35] *See also In re Apache Corp.*, 2022 WL 4277350, at *6-7 (S.D. Tex. Sept. 15, 2022), report and recommendation adopted, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022) (scienter pled, as here, where defendants "moved forward with the project on a wing and a prayer" that was a "Hail Mary pass").

[36] Because the CAC adequately alleges a primary violation of § 10(b) and the Individual Defendants' control, it adequately alleges control person liability under § 20(a). *See Rensin*, 2024 WL 4651837, at *12. Should the Court grant any aspect of Defendants' Motion, Plaintiffs respectfully request leave to amend. *Busic*, 2022 WL 3299843, at *25.

Dated: April 4, 2025

Respectfully submitted,

By: */s/ Peter S. Lubin*
**LUBIN AUSTERMUEHLE DITOMMASO, P.C.**
Peter S. Lubin (Bar No. 6185789)
Patrick D. Austermuehle (Bar No. 6299005)
17W220 22nd Street, Suite 410
Oakbrook Terrace, IL 60181
Tel.: (630) 333-0333
Email: peter@l-a.law
Email: patrick@l-a.law

**LAW OFFICE OF TERRENCE BUEHLER**
Terrence Buehler (Bar No. 6181738)
417 North Marion Street
Oak Park, IL 60302
Tel.: (312) 371-4385
Email: tbuehler@tbuehlerlaw.com

*Liaison Counsel for the Class*

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
Morgan M. Embleton (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: membleton@zlk.com

*Counsel for Lead Plaintiff Christopher G. Collins and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
Maya Saxena (*admitted* pro hac vice)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
Email: msaxena@saxenawhite.com

-and-

31

David R. Kaplan (admitted *pro hac vice*)
Emily R. Bishop (admitted *pro hac vice*)
505 Lomas Santa Fe Dr., Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
Email: dkaplan@saxenawhite.com
      ebishop@saxenawhite.com

*Counsel for Plaintiff the Fire & Police Employees'
Retirement System of the City of Baltimore and
Additional Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Carol V. Gilden (Bar No. 6185530)
190 South LaSalle Street
Suite 1705
Chicago, IL 60603
Tel.: (312) 629-3737
Fax: (312) 357-0369
Email: cgilden@cohenmilstein.com

*Liaison Counsel for Plaintiff the Fire & Police
Employees' Retirement System of the City of
Baltimore*

32

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ Peter S. Lubin*