## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re Walgreens Boots Alliance Securities Litigation | Case No. 24-cv-5907 |
| | Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Christopher Collins and the Fire and Police Employees' Retirement System of the City of Baltimore brought this putative class action against Defendants Walgreens, Rosalind Brewer, James Kehoe, John Driscoll, John Standley, Tim Wentworth, and Manmohan Mahajan. The complaint [50] contains two counts: one alleging that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and the second alleging that the individual Defendants violated Section 20(a) of the Exchange Act. Before the Court now is Defendants' motion [57] to dismiss the complaint and Defendants' motion [71] to strike an appendix [69-1] (the "Appendix") that Plaintiffs filed in support of their opposition to the motion to dismiss. For the reasons stated herein, Defendants' motion to dismiss is granted in part and denied in part, and Defendants' motion to strike is denied.

### I.   Background

#### A. Overview

1

The following factual allegations taken from the operative complaint [50] are accepted as true for the purposes of the motion to dismiss. *See Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

On October 14, 2021, Defendant Walgreens announced a $5.2 billion investment in VillageMD, a startup primary care provider with a network of thousands of physicians (the "VillageMD Venture"). [50] ¶¶ 1-2. Walgreens and VillageMD planned to roll out doctor-staffed, full-service primary care clinics at roughly 1,000 of Walgreens' U.S. stores. [50] ¶ 1.[1] Defendants touted this investment as a "transformational" new healthcare strategy, and, following its announcement, Walgreens' stock price rose to $54.33. [50] ¶ 2. For the next several years, Walgreens continued to represent to the market that this strategy "would be a significant profit driver" and that their model "work[ed]," and Walgreens invested a total of $10 billion in the venture. [50] ¶¶ 2, 191. In November 2022, Walgreen announced that it was purchasing another physician-led healthcare services company called Summit Health-CityMD ("Summit"). In the summer of 2024, however, Walgreens revealed that its foray into primary care health services had been a failure and that the company was abandoning its healthcare strategy. [50] ¶ 12. After that announcement, the company's stock price fell to $12.19. [50] ¶ 13.

Plaintiffs allege that between the announcement on October 14, 2021, and July 27, 2024 (the "Class Period"), Defendants knew or had reason to know that the VillageMD Venture was a failure but made false representations or omissions to the

---

[1] Walgreens referred to its store locations that contained a VillageMD clinic as a "co-located clinic." *See* [50] ¶ 89.

2

market regarding its viability. *See generally* [50]. To buttress their claims, Plaintiffs interviewed several current former and former Walgreens and VillageMD employees ("Confidential Witnesses" or "CWs") who provided statements about challenges the VillageMD Venture purportedly faced during the class period. *Id*.

### B. Defendants[2]

Defendant Walgreens is a retail pharmacy store chain headquartered in Deerfield, Illinois. [50] ¶ 18. It is one of the largest pharmacy chains in the world.

Defendant Brewer served as Walgreens' CEO and a member of its board of directors from March 15, 2021, until August 31, 2023. [50] ¶ 19. Between April 2022 and August 2023, she also served on Village MD's board of directors. [50] ¶ 19

Defendant Kehoe served as Walgreens' executive vice president and Global CFO from June 2018 through August 2023. [1] ¶ 20.

Defendant Driscoll served as Executive Vice President and President of Walgreens' U.S. Healthcare segment from October 2022 until February 2024. [1] ¶ 21. He began serving on VillageMD's board of directors in 2023. [1] ¶ 21.

Defendant Wentworth served as Walgreens' CEO since October 2023 and is a member of its board of directors. [50] ¶ 23.

Defendant Mahajan served as Walgreens' interim CFO from July 2023 through February 2024 and served as Walgreens' Executive VP and Global CFO since February 2024. [1] ¶ 24. Mahajan also served on VillageMD's board of directors beginning in 2024. [1] ¶ 24.

---

[2] Plaintiff named John Standley as an individual defendant in the complaint, but later voluntarily dismissed him. [67].

### C. The Confidential Witnesses

CW 1 served as the national medical director at VillageMD from September 2020 until July 2022, and Executive Vice President of VillageMD from December 2021 until July 2022. [50] ¶ 86 n.4. He reported directly to the C-Suite. *Id*. CW 1 reported that throughout his tenure at VillageMD, "the vast majority of the Walgreens co-located clinics were underperforming." [50] ¶ 89.

CW 2 served as an executive director for VillageMD in Arizona from February 2021 until December 2021, and the market president in Arizona from January 2022 until September 2022. [50] ¶ 88 n.5. He was responsible for opening 30 clinics in Arizona in 2021, and he reported that "all of them" underperformed. [50] ¶ 88.

CW 3 served as a business development director for VillageMD from April 2019 through June 2023. [50] ¶ 90. He reported that nationally, only 30% of the co-located clinics "did well," and the remaining 70% were "dismal failures." [50] ¶ 90. He explained the clinics struggled in large part because their success depended on finding physicians who were willing to relocate their practices to a co-located clinic. [50] ¶ 94. To get physicians to relocate to a clinic, Walgreens had had to pay them exorbitant amounts of money. [50] ¶ 95. CW 3 reported that many clinics were never able to recruit a physician at all. [50] ¶ 96.

CW 4 served as VillageMD's director of clinical operations from July 2021 through August 2022. [50] ¶ 97. Like CW 3, he reported that the clinics struggled because Walgreens was unable to adequately staff them. [50] ¶ 97.

4

CW 5 served as a lead for the Walgreens regional implementation team in the Florida market. [50] ¶ 124. He reported that by mid-2022, the entire rollout of VillageMD co-located clinics had been put on hold. [50] ¶ 124. By mid-2023, Walgreens and VillageMD laid off hundreds of employees nationwide, including the implementation teams responsible for opening co-located clinics. [50] ¶ 141. CW 5 also reported that Walgreens store managers were required to have regular meetings with the managers of VillageMD clinics to discuss the clinics' performance. [50] ¶ 154.

CW 6 served as regional practice administrator for a separate entity in Rhode Island beginning in 2013. [50] ¶ 92. He joined VillageMD in March 2021 when VillageMD acquired his prior employer. [50] ¶ 92 n.9. He reported that it was clear that VillageMD was a "sinking ship" within six months of joining VillageMD. [50] ¶ 92.

CW 7, the VillageMD senior director of strategic growth, reported that he had visibility into all markets and that it was obvious to him by late 2021 that the investment was struggling. [50] ¶ 92.

CW 8 served as a lead for the Walgreens regional implementation team in Florida from January 2019 through June 2023. [50] ¶ 92. He reported that Walgreens opened clinics "too fast and that doctors and nurses could not be recruited to properly staff them," causing clinics to "s[it] empty for months." [50] ¶ 103.

CW 9 served as the director for revenue cycle management for Walgreens' U.S. Healthcare segment and reported directly to the segment's CFO from September 2021 through July 2023. [50] ¶ 92. He reported that "[i]t was very obvious" that Walgreens

was not getting the return on the VillageMD Venture that they had hoped for within "a couple of months" of starting. [50] ¶ 92.

CW 10 was a practice manager for VillageMD in Pheonix, Arizona between March 2020 and September 2022 and was responsible for staffing co-located clinics. [50] ¶ 99. He reported that the co-located clinic model "was not sustainable" because they "couldn't hire physicians as fast as they were in building" clinics. [50] ¶ 99.

CW 11 was a VillageMD Regional Administrator who was responsible for clinic buildouts and practice group acquisitions in Texas from November 2020 through February 2022. [50] ¶ 105. He reported that several facilities opened in 2021 that Walgreens was unable to staff. [50] ¶ 105. He further reported that Walgreens and VillageMD only opened clinics to "cook the books and look super profitable." [50] ¶ 105.

CW 12 served as a VillageMD National Medical Director in Texas from February 2023 through August 2024. [50] ¶ 106. He was responsible for evaluating the performance and profitability of existing clinics, and he reported that co-located clinics struggled because Walgreens opened "too many clinics too fast." [50] ¶ 106.

CW 13 served as a Walgreens vice president of pharmacy and retail operations until November 2023. [50] ¶ 112. He reported that the co-located clinic model "didn't work." [50] ¶ 112. He also reported that "there were definitely meetings" between the executives of Walgreens and VillageMD, where the executives "shar[ed] every detail" about the VillageMD Venture. [50] ¶ 153. CW 13 further reported that Walgreens executives received data showing that co-located clinics failed to hit several internal

6

metrics that the company tracked, including metrics related to staffing. [50] ¶¶ 158-59.

CW 14 served as a vice president of market integration for VillageMD and explained that the co-located clinics struggled because customers did not understand them. [50] ¶ 113.

CW 15 served in various roles at Walgreens and opened more than 20 co-located clinics. [50] ¶ 114 n.20. He reported that many clinics were built in areas with high-Medicaid populations, but that VillageMD did not accept Medicaid. [50] ¶ 122.

CW 16 served as a regional president from January 2016 through July 2023 and was responsible for VillageMD's operations in five different markets. [50] ¶ 114. He reported that the VillageMD model did not work in Walgreens stores. [50] ¶ 114. By the end of his tenure, he was reporting to the former CFO and COO of VillageMD. [50] ¶ 114 n.21.

CW 17 served as Walgreens' group vice president, operations planning and strategic initiatives from May 2019 through May 2022. [50] ¶ 118. He reported that that the VillageMD Venture failed in part because VillageMD and Walgreens disagreed strategically about where clinics should be built. [50] ¶ 118.

CW 18 served as a Walgreens district manager in Atlanta, Georgia. [50] ¶ 135. Like CW 5, he reported that Walgreens put in place a "nationwide hold" on all new co-located clinics in 2022. [50] ¶ 135. He also reported that in April 2023, the employees responsible for opening new clinics were laid off. [50] ¶ 141. He further

reported that everyone at Walgreens from the director level and above "absolutely" had access to VillageMD performance metrics. [50] ¶ 161.

CW 19 served as director and senior director of clinical quality pharmacy at VillageMD between August 2021 and July 2023. [50] ¶ 137.

CW 20 served as director of financial planning and analysis for Summit Health in New Jersey beginning in January 2022. [50] ¶ 139. He reported that Walgreens acquired Summit Health "to achieve growth targets" because VillageMD was not delivering growth organically. [50] ¶ 139.

CW 21 served as vice president of process improvement for VillageMD. Like CW 18, CW 21 reported that everyone at the director level or higher at Walgreens had access to VillageMD metrics, which would have allowed them to see if clinics were meeting various performance targets. [50] ¶ 161.

### D. Timeline

#### i. Events Prior to the Class Period

On April 10, 2019, Walgreens announced a pilot program with VillageMD to launch doctor-staffed, value-based primary healthcare clinics attached to or inside of existing Walgreens stores. [50] ¶ 41. The pilot project consisted of VillageMD operating five of these "co-located" primary care clinics at Walgreens stores in Houston, Texas. [50] ¶ 41. Approximately a year after the launch of the pilot program, Walgreens announced a $1 billion investment in VillageMD to fund an expansion of the partnership and to enable the rollout of hundreds of new co-located clinics nationwide. [50] ¶ 44. By January 2021, Walgreens announced that it was

accelerating payment of the initial $1 billion investment "to increase the pace and scale of the rollout of the clinics," and that it planned to open 600 or 700 clinics in just four years. [50] ¶ 47.

### ii. Start of the Class Period

On October 14, 2021, Walgreens announced that it was investing an additional $5.2 billion in VillageMD and that they would offer "full-service primary care practices with primary care physicians and pharmacists co-located at its stores all under one roof." [50] ¶ 202. According to the announcement, Walgreens would have more than 80 co-located open facilities by the end of the year. Walgreens made various estimations about future financial projections, including Walgreens' earnings per share ("EPS") growth. [50] ¶ 206. During an earnings call that same day, Defendant Brewer represented that the strategy would be successful because Walgreens "already [knew] how to work with VillageMD" and "[knew] how to scale their model." [50] ¶ 208. She further represented that "VillageMD [was] focused on all patient populations," including Medicaid, and Defendant Kehoe echoed that VillageMD accepted "all types of insurance." [50] ¶ 208.

In November 2021, Defendants made similar comments about the venture. *See* [50] ¶¶ 211-12. Defendants further represented that at that point, they were currently operating co-located clinics at 70 different locations, and that they planned to scale to 1,000 locations by the end of 2027. [50] ¶ 212.

### iii. First Half of 2022—Additional Clinic Openings

Beginning in January 2022, Defendants continued to announce various metrics about co-located clinic openings, including that they were opening a new clinic every 4-5 days, and that they planned to have at least 160 opened by the end of the year. [50] ¶¶ 215-16. During a Q1 2022 earnings call, Defendant Brewer stated that Walgreens was "making meaningful progress towards [its] strategic priority," and Defendant Kehoe stated that the "[U.S. Healthcare] segment [was] tracking towards [its] strategic priority." [50] ¶¶ 216.

Defendants continued to highlight new clinic openings in March of 2022 and emphasize that co-located clinics offered comprehensive, full-service, primary care. [50] ¶¶ 223, 226. That month, Defendant Kehoe emphasized that "VillageMD is very much on track." [50] ¶ 227.

In June of 2022, Defendants again announced new clinic openings, declared that Walgreens was "tracking well against all of [its] key milestones for [the U.S. Healthcare segment] this year," and said in reference to VillageMD that there had been "good success in terms of the initial investments". [50] ¶¶ 230-31.

### iv. Second Half of 2022—CWs Report that Walgreens Halts Clinic Openings; Walgreens Represents that Clinic Openings are a KPI and Furthers its Investment.

As alleged in the Complaint, CW 5 and CW 18 reported that by mid-2022, Walgreens had put a "nationwide hold" on opening any new clinics. [50] ¶¶ 124, 135.

In October 2022, Walgreens issued a press release announcing that investors should consider the number of co-located clinics and total number of VillageMD clinics to be "key performance indicators" ("KPIs") for Walgreens. [50] ¶ 236. The

10

release stated that "[Walgreens'] management has evaluated its results of operations using these metrics and believes that these [KPIs] … provide additional perspective and insights when analyzing the core operating performance of [Walgreens] from period to period and trends in its historical operating results." [50] ¶ 236. The release stated that Walgreens was on track to have 200 co-located clinics opened by the end of the year. [50] ¶ 236. The release contained various financial projections, including that Walgreens "ha[d] a clear line of sight to positive adjusted EBITDA in fiscal '24" that adjusted EPS was "building to low teens grown in 2025," and that Walgreens "expect[ed] U.S. Healthcare to contribute to half of the annual adjusted EPS growth over the long term." [50] ¶ 242.

That same day, Defendant Brewer reported that Walgreens "delivered way ahead of [its] expectations in fiscal year '22," that it was "scaling [its] winnings assets to accelerate growth and profitability of [its] U.S. Healthcare business," and that "[its] strategy was working." [50] ¶ 237. Defendant Kehoe underscored that the "clinic rollout at VillageMD continue[d] on pace" and that "VillageMD grew in line with plan[,] and revenue growth is on track as we launch new clinics, scale existing clinics, and increase value-based arrangements." [50] ¶ 237. When asked by an analyst about VillageMD's profitability, Kehoe responded "we actually accelerated the investments in 2022 . . . '[w]e're doubling down. This is a scale business." [50] ¶ 237.

During the same call, an analyst asked Brewer to discuss "labor headwinds [Walgreens was] seeing across [U.S. Healthcare]." [50] ¶ 240. Brewer responded that "there's really no impact there. That's our primary care physician position through

11

VillageMD. We're continuing to grow the number of primary care physicians. So we're not really seeing a labor issue on our [U.S. Healthcare] side." [50] ¶ 240.

In November, Walgreens invested an additional $3.5 billion in VillageMD. [50] ¶ 74. The purpose of the investment was to fund VillageMD's acquisition of another physician-led healthcare services company, Summit. [50] ¶ 74.

### v. 2023: Walgreens Misses Guidance; Kehoe and Brewer Resign

In January 2023, Walgreens announced that it met its 2022 clinic-opening goal, and Brewer stated that Walgreens was "quickly scaling U.S. healthcare with a defined path to achieve profitability exiting this fiscal year." [50] ¶ 245. During a call with investors, Brewer stated that Walgreens was "executing [its] strategic vision that [it] set out just over a year ago," and that the VillageMD "strategy is working." [50] ¶ 246.

During a March 2023 earnings call, Kehoe stated that Walgreens was "seeing benefits on [its] side from [its] partnership with VillageMD," and provided another update on the number of open clinics. [50] ¶ 251. In that same call, Driscoll represented that "the [VillageMD] model works, and we've seen it work with some of the legacy businesses in multiple geographies. We're confident, and we don't see any challenges to the actual model of what we're delivering for patients and with providers in those markets. So the trends are positive." [50] ¶ 252 (cleaned up).

In June 2023, Walgreens issued a press release and held an earnings call to discuss its financial results from the prior quarter. [50] ¶ 256. There, Walgreens disclosed that its adjusted EPS had fallen short of its previous guidance and of

12

analysts' estimate, and that the decline was driven by "softness in the U.S. Healthcare and U.S. Retail Pharmacy segments." [50] ¶ 256. Walgreens' stock price fell more than 10% on the news. [50] ¶ 256. In the press release, however, Walgreens reported that it was "taking immediate actions to drive sustainable grown" in fiscal year 2024, including "swift actions to improve the U.S. Healthcare path to profitability," "[a]ccelerating synergies between U.S. Healthcare and Walgreens operations," and building additional clinics. [50] ¶ 257. During a call with investors, Brewer stated that despite the "slower profit ramp for U.S. healthcare," Walgreens "ha[d] the right strategy in place" and was "addressing current challenges head on and moving at a pace to deliver long-term shareholder value." [50] ¶ 257.

In July 2023, Walgreens issued a press release announcing that Kehoe, then the CFO, was departing the company. [50] ¶ 172. Approximately one month later, Walgreens issued another press release stating that Brewer, then the CEO, would likewise be exiting. [50] ¶ 174. Both press releases made clear that Walgreens had no planned replacement for either executive. [50] ¶ 174.

In September 2023, an analyst asked Driscoll if Walgreens was still targeting the same clinic opening milestones and whether they were still planning to open 600 co-located clinics by 2025 and 1,000 by 2027. [50] ¶ 260. Driscoll responded: "Yes, I think we should be—I'm obsessively focused on delivering better results faster." [50] ¶ 260.

In October 2023, Walgreens held another earnings call. [50] ¶ 264. There, Driscoll disclosed that Walgreens planned to "exit approximately five markets and approximately 60 [co-located] clinics in fiscal 2024" because the clinics were located

in "nonstrategic markets." [50] ¶ 264. But Driscoll further stated that "[e]very one of [Walgreens'] clinics actually shows month-over-month growth" and that "our strategy going forward will be really focusing on markets where we see that momentum . . . ." [50] ¶ 264.

### vi. Early 2024

In January 2024, Walgreens issued a press release and held an earnings call. [50] ¶ 266. During the call, Defendant Mahajan assured investors that Walgreens was "making progress to accelerate profitability at VillageMD," and in response to an analyst question, Defendant Wentworth said "there's no question that [VillageMD] has put themselves on a good path, both in terms of their costs and their footprint, getting to a place where they're going to be meaningfully growing and profitable." [50] ¶ 267. A few days later, in responding to another analyst questioning whether Walgreens was on track to meet fiscal year 2024 guidance, Mahajan stated that Walgreens "want[s] to really concentrate on accelerating the profitability within Village[MD] . . . so yes, I think [Walgreens is] moving in the right direction as it relates to where the fiscal year is." [50] ¶ 269.

In March 2024, Walgreens issued another press release, where Wentworth reports that Walgreens was "continuing to strategically review [its] portfolio over the next three months in an effort to ensure it drives growth and delivers value." [50] ¶ 271. Wentworth further stated: "turning to U.S. Healthcare[,] [w]e have reached an important milestone delivering [Walgreens' first ever quarter of positive adjusted EBITDA . . . [and] VillageMD's actions to accelerate profitability, including recent

rightsizing of their cost structure, optimizing their clinic footprint and growing patient panels, are driving improvement in adjusted EBITDA." [50] ¶ 272. Mahajan likewise stated that Walgreens "expect[ed] [VillageMD] to continue to drive growth as they focus on the core markets as well as continue on their cost actions that they are going through this year." [50] ¶ 272.

### vii. June 2024: Walgreens announces it is abandoning the VillageMD Venture

On June 27, 2024, The Wall Street Journal published an interview with Wentworth wherein Wentworth acknowledged that Walgreens planned to divest itself from VillageMD and that the VillageMD Venture was "a strategy that [Walgreens was] no longer pursuing." [50] ¶ 191. The same day, Walgreens issued a press release reporting that its adjusted EPS had fallen nearly 37% from the prior quarter and confirming that Walgreens planned to close certain underperforming stores. [50] ¶ 192. That day, Walgreens' stock price fell by 22%, the largest single-day percentage drop in the company's history. [50] ¶ 193.

## II.   Legal Standard

### A. Section 10(b) and Rule 10b-5 Claims

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege (i) a material misrepresentation or omission by the defendant; (ii) scienter, (iii) a connection between the misrepresentation or omission and the purchase or sale of a security, (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Stransky v. Cummins Engine Co.*, Inc., 51 F.3d 1329, 1331 (7th Cir. 1995). Plaintiffs

15

alleging securities violations must meet the "[e]xacting pleading requirements" of the PSLRA, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (Tellabs I), which require plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. § 78u-4(b)(1); see also *Tellabs* I, 551 U.S. at 321.

### i. Scienter

To allege scienter, a plaintiff must plead facts supporting an inference that the defendant acted with "intent to deceive, demonstrated by knowledge of [a] statement's falsity or reckless disregard of a substantial risk that the statement is false." *Cornielsen v. Infinium Cap. Mgmt.*, LLC, 916 F.3d 589, 601 (7th Cir. 2019) (quotation omitted). Scienter must be established for each misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). To establish scienter for a corporation, a plaintiff must specifically allege "the state of mind of the individual corporate official or officials who make or issue the statement … rather than generally to the collective knowledge of all the corporation's officers." *Pugh v. Tribune Co.*, 521 F.3d 686, 697 (7th Cir. 2008) (citations omitted). A culpable scienter inference "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (*Tellabs II*). Rather, it need only be "cogent and at least as compelling as any opposing … one." *Id*.

### ii. Defenses

The PSLRA renders a statement non-actionable when the statement is a forward-looking projection of "revenues, … earnings …, or other financial items," "the plans and objectives of management for future operations," and "future economic performance," 15 U.S.C. § 78u-5(i)(1)(A), (B), (C), and the statement *either* is identified with "meaningful cautionary statements" *or* the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false or misleading, 15 U.S.C. § 78u-5(c)(1)(A), (B). "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs Inc.*, 513 F.3d at 705 (the phrase "still going strong" used to describe sales is a mixed statement and the element of prediction did not entitle the defendant to a safe harbor regarding the statement's representation of current sales)

Further, statements that are immaterial puffery are non-actionable. "Puffery comprises excessively vague, generalized and optimistic comments, not the sort of statements that a reasonable investor, exercising due care, would view as moving the investment-decision needle—that is, they're not material." *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 877 (N.D. Ill. 2023) (internal citations and quotations omitted).

Relatedly, a "sincere statement of pure opinion is not an untrue statement of material fact" and is thus not actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189–90 (2015) (internal citations and quotations omitted). A belief does not become actionable because it later "turned out to be wrong." *Id.* at 186. For an opinion to be actionable, a plaintiff "must identify

17

particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (citation omitted).

### B. Section 20(a) Claim

In order to state a claim under Section 20(a), a plaintiff must allege: (1) a primary securities violation (in this case, a violation of Section 10(b) of the Exchange Act); (2) that an individual defendant exercised general control over the operations of Walgreens; and (3) that the individual defendant "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

### III. Analysis

### A. The PLSRA and Defendants' Motion to Strike

Plaintiffs allege that Defendants made 80 materially false and misleading statements throughout the Class Period. *See* [50] ¶¶ 201-73. The PSLRA's "[e]xacting pleading requirements" demand that plaintiffs "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs I*, 551 U.S. at 321.

By and large, Plaintiffs' complaint fails to meet this exacting standard. Rather than identify each individual statement and each reason or reasons why that

18

statement is misleading, the 145-page complaint contains several paragraphs with large handfuls of Defendants' statements together, *see, e.g.*, [50] ¶¶ 206 (containing four statements),  219 (containing six), 231 (containing five), and then repeats one of two stock paragraphs containing near-verbatim explanations of why the statements were misleading. *See* [50] ¶¶ 204, 209, 213, 217, 220, 224, 228, 232, 238, 248, 254, 261 (representing one set of nearly identical paragraphs purportedly explaining why swaths of Defendants' Statements spanning a 24-month period were misleading); 205, 214, 218, 221, 225, 229, 249, 255, 262 (representing another set of nearly identical paragraphs doing the same).

Not surprisingly, Defendants took note of this failure and argued in their opening brief that the complaint should be dismissed outright for failing to adequately pair each challenged statement with an allegation that renders the statement misleading. [57] at 11 n.3. In response, Plaintiffs' counsel filed a declaration that contains a 54-page Appendix delineating each alleged statement and listing the reason(s) why that statement is misleading, as the PLSRA mandates. [69-1]. Defendants filed a motion to strike the Appendix, arguing that (1) at 54 pages, it is nearly twice the length of Plaintiffs' opposition brief and well over the page limits that the parties agreed on, and (2) it serves as an improper attempt to amend the complaint. *See generally* [72].

The Court shares in Defendants' frustration at Plaintiffs' failure to include statement-by-statement allegations in their already expansive complaint. But as a practical matter, striking the appendix and dismissing the complaint for failure to comply with the PSLRA would lead only to Plaintiffs filing an amended complaint,

which would serve only to increase the costs of the parties and delay a resolution. To the extent that the Appendix includes any facts not contained in the, the Court declines to consider those. Accordingly, the motion to strike [71] is denied.

### B. Section 10(b) and 10b-5 Claim

The Court now turns to Defendants' alleged misstatements underlying Plaintiffs' Section 10(b) and 10b-5 claim. Neither party address each alleged misstatement individually but instead group them into various categories and discuss them as collectives. The parties delineate between statements related to clinic openings, statements related to clinic performance, statements related to milestones and guidance, and statements about Medicaid.[3] Because many of the statements are duplicative of one another, the Court also analyzes them categorically.[4]

### i. Statements Regarding Clinic Openings

### 1. Statements from 2021—June 2022

Plaintiffs allege that Defendants made multiple materially misleading statements regarding the opening of co-located clinics.[5] For example, in their October 14, 2021 announcement of the VillageMD Venture, Walgreens announced that they and VillageMD "have 52 co-located primary care practice locations currently open, and will have more than 80 open by the end of this calendar year." [50] ¶ 202.

---

[3] The parties do not agree on which statements fall into which categories, and some statements fall into multiple categories.

[4] To the extent that the Court references a specific individual statement, it uses the numbering convention in Defendants' first exhibit to their motion to dismiss, *see* [57-1].

[5] Statements 1, 2, 9, 10, 13, 14, 15, 16, 18, 22, 23, 25, 26, 28, 29, 30, 32, 34, 35, 36, 39, 40, 41, 46, 47, 57, 60, 61, 62, 65.

Plaintiffs' complaint alleges that this statement is both false and misleading. [50] ¶ 203.

Defendants argue that these statements are not false because they accurately reflect the number of clinics that had opened at the time they were made. In their response, Plaintiffs agree, *see* [68] at 15, apparently disavowing their repeated allegations that such statements were false.

Plaintiffs argue, however, that the statements are nonetheless misleading because, by touting clinic openings as evidence of the venture's success, Defendants "created a duty to disclose that the clinics were not fully operating and were significantly underperforming targets." [68] at 15-16. This question—to what degree Defendants' statements about clinic openings created a duty to discuss the success of the clinics—is central to the parties' disagreement.

"Mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995); *see also Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). "Disclosure is required," however, "when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also Stransky*, 51 F.3d at 1331 ("If one speaks, he must speak the whole truth."); *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."). On a motion to dismiss,

"the relevant question for deciding whether a statement is misleading is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission.'" *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 638 (N.D. Ill. 2020) (quoting *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006), *rev'd on other grounds by Tellabs II*, 551 U.S. 308 (2007)). Whether a statement is misleading "depends on the perspective of a reasonable investor: The inquiry ... is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175, 186–87 (2015).

Here, Plaintiffs have fallen well short of alleging facts sufficient to support a belief that the large majority Walgreens' announcements regarding clinic openings were misleading.

First, while Plaintiffs rely heavily on damning statements from various CWs, neither the complaint nor Plaintiffs' Appendix contain (or even allow to be inferred) a coherent chronology explaining how most of the CWs' statements align with Defendants' various alleged misstatements. For example, and as noted above, Plaintiffs allege that Defendants misled investors by announcing on October 14, 2021 that they were currently operating 52 co-located clinics without also disclosing that the majority of their clinics were underperforming. In support of that claim, they rely on statements from CW 2, who opened clinics in Arizona and reported that "all of them" underperformed. [50] ¶ 88; [69-1] at 1. But Plaintiffs never allege that *any* stores had already underperformed at the time Defendants made any statements on October 14, 2021—in fact, the complaint suggests the opposite, *see* [50] ¶ 87 (alleging

that Walgreens only opened co-located clinics in Arizona after their pilot project); 89 (containing reports from a CW that the pilot project *was successful*). Plaintiffs' argument is essentially that Defendants misled investors by failing to disclose information based on events that *had not occurred* at the time the statements were made. Such allegations are insufficient to state a claim.

Second, with respect to statements about clinic openings that *were* made after various stores had allegedly underperformed, the law does not support Plaintiffs' sweeping proposition that Defendants created a duty to disclose all information related to clinics' performance simply by announcing that they had opened clinics. While Plaintiffs are correct generally that "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *Jinkosolar,* 761 F.3d at 250, a "corporation is not required to reveal all facts on a subject just because it reveals a single fact." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 582 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). Disclosure of additional facts is only necessary when, absent disclosure, the at-issue statement would be misleading. Here, the at-issue statements are, *e.g.*, "[Defendants] today announced plans to open 20 new Village Medical at Walgreens primary care practices in the Tampa area over the next year." [50] ¶ 211. There are no facts that need to be disclosed to prevent that statement from misleading an investor because there are no facts alleged that make the statement misleading. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) ("A corporation need not couple each piece of good news with disclosure of some tangential difficulty."); *c.f. Allison v. Oak St.*

*Health, Inc.*, No. 22 C 149, 2023 WL 1928119, at *6 (N.D. Ill. Feb. 10, 2023) (statements actionable where Defendants touted its patient acquisition strategy without disclosing that the strategy violated federal law). This is particularly so because, at the time the statement was made, Defendants were regularly disclosing that the VillageMD venture would lose money for at least several years. *See* [57] at 19-20 (containing numerous warnings that it would take several years for the VillageMD Venture to become profitable); *see also Smykla v. Molinaroli*, 85 F.4th 1228, 1236 (7th Cir. 2023) (opinions only actionable when misleading to a reasonable person reading the statement fairly and in context).

Further, Defendants' alleged statements like the one above, that merely announce planned future openings, are protected as forward-looking statements because Plaintiffs do not allege that any facts sufficient to show that, prior June 2022, any statements about future clinic openings were made with knowledge of falsity. Indeed, as noted above, Plaintiffs seem to concede that the statements were true.[6] Accordingly, Plaintiffs failed to allege any actionable statements related to clinic openings from prior to June 2022.

### 2. Statements from after mid-2022

---

[6] Plaintiff also argues that at least some clinic opening statements are not protected by the safe harbor because the statements contain elements of the present tense. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (safe harbor doesn't apply to representations that sales were "still going strong" because it concerns current sales). Plaintiff argues that, for example, Kehoe's statement in March 2022 that "Village[MD] is still very much on the track . . . towards [Defendants'] goal of 200 [open clinics] by the end of the calendar year 2022" is not entitled to protection. [68] at 21-22. Insofar as statements like this contain a present-tense statement of fact regarding the number of clinic openings or the pace at which they were being opened, Plaintiff is correct that Defendant cannot rely on the safe harbor. But those statements are still not actionable because, as discussed above, Plaintiff has not alleged any specific facts showing that the statements themselves were false or otherwise misleading at the time they were made.

By mid-2022, Plaintiffs allege that Walgreens placed a nationwide hold on opening future co-located clinics. [50] ¶¶ 124, 134-35. Plaintiffs further allege that Walgreens made several statements after the nationwide hold went into effect boasting about the numbers of clinic openings in the future. *See* [50] ¶ 237 (saying on October 13, 2022 that "the clinic rollout at VillageMD continues on pace", and ". . . instead of 160 clinics in calendar '22, we've gone to 200. So we're actually doing the smart thing. We're doubling down."); [50] ¶ 68 (answering an analyst question about whether Walgreens was on pace to have 1,000 clinics at their stores by 2027 by saying "Yes, I think we should be . . ."). These statements, made after Defendants had already allegedly decided internally to abandon the roll-out, allege plausibly false and misleading statements. To say that Walgreens was "doubling down" on opening clinics when the opposite was allegedly true is a straightforward false statement of fact.[7] Accordingly, Plaintiffs have adequately alleged that statements numbered 47 ("Were doubling down," made by Kehoe) and 68 ("Yes, I think we should be [on track to open 1,000 clinics by 2027]," made by Driscoll) were materially false and misleading.

### ii. Statement Regarding Key Performance Indicators

Next, Plaintiffs allege that Walgreens made a false and misleading statement when it issued a press release describing the "number of co-located VillageMD clinics and number of total VillageMD clinics" as "key performance indicators" that "provide

---

[7]Other contemporaneous alleged misstatements about clinic openings made after Walgreens decided to internally wind down their clinic rollout that merely repeat the number of clinics that Walgreens had opened, *e.g.*, [50] ¶ 245 (statement that Walgreens had opened 200 co-located clinics in 2022) are neither false nor misleading for the reasons discussed *supra*.

additional perspective and insights when analyzing the core operating performance of [Walgreens] . . .". [50] ¶ 236.[8] But Plaintiffs fail to allege any facts suggesting the Walgreens *didn't* believe that the number of clinics was a key performance indicator or that that number *didn't* provide additional perspective and insights. *See City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 497 (S.D.N.Y. 2021) (defendants "entitled to their opinion" that a particular metric was "the best metric for measuring the company's financial health"). And Plaintiffs' argument that the statement is misleading because it didn't disclose other problems with the clinics fails for the same reasons as described above: Defendants' decision to talk about one metric does not impose on them an obligation to reveal other, less flattering metrics.

### iii. Statements Regarding Growth, Projections, and Milestones

Separately, Plaintiffs allege that large swaths of statements related to growth, projections, and milestones were materially false or misleading. *E.g.*, [50] ¶¶ 206 ("[W]e see a clear path to a growth model that aims for EPS growth of 11% to 13%); 236 (the "number of co-located VillageMD clinics and number of total VillageMD clinics [are] key performance indicators . . ."); 246 ("We're executing our strategic vision that we set out just over a year ago"); 257 ("[Walgreens] is taking immediate actions to drive sustainable growth").

---

[8] Statement 42. [57-1].

Defendants argue that each statement is protected under the forward-looking safe harbor or because the statement is an opinion or mere puffery (or both). Overwhelmingly, the Court agrees.

## 1. Statements of Optimism

Defendants argue that several of the challenged statements are vague statements of optimism that amount to puffery. "Puffery comprises excessively vague, generalized and optimistic comments, not the sort of statements that a reasonable investor, exercising due care, would view as moving the investment-decision needle—that is, they're not material." *Phoenix Ins. Co. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 877 (N.D. Ill. 2023) (internal citations and quotations omitted). "[I]ndefinite predictions of 'growth' are better described as puffery rather than as material statements of fact." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). Generally, "predictions and forecasts which are not of the type subject to objective verification are 'rarely' actionable under the PSLRA." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015) (quoting *Searls*, 64 F.3d at 1066).

Statements to the effect that the VillageMD strategy was "working", was "highly scalable," or had met "key milestones" are inactionable puffery. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (statement that corporate project was "progressing as planned" is inactionable puffery); *Roth v. OfficeMax, Inc.*, 2006 WL 2661009, at *4 nn.3, 4 (N.D. Ill. Sept. 13, 2006) (statements that new business "will be strategically stronger," that "sales and income should increase substantially," and that the company "will post sharply

higher sales and operating income" were "inactionable puffery"); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 745 (7th Cir. 1997) (noting "[t]he heart of a reasonable investor does not begin to flutter when a firm announces that some project or process is proceeding smoothly, and so the announcement will not drive up the price of the firm's shares to an unsustainable level"); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022) (statement that company met "key milestones" without specifying what those milestones were is inactionable); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (statements that was "poised to carry . . . growth and success . . . well into the future" were merely "loose prediction" and "anything but definite.").

Plaintiffs have not alleged any facts sufficient to support an inference that an investor would consider an indefinite statement about scaling VillageMD's or meeting milestones model to be anything more than puffery. Further, even if the statements weren't puffery, Plaintiffs allege no facts to show that any of them are either false or misleading. For example, Plaintiffs allege that it was false for Defendant Mahajan to say in January 2024 that Walgreens was "making progress to accelerate profitability at VillageMD," [50] ¶ 267, but nowhere alleges that Walgreens *wasn't* making progress to accelerate VillageMD profitability. Accordingly, these and similar statements[9] are not actionable.

## 2. Statements Forecasting Growth Metrics

---

[9] Statements 11, 12, 13, 14, 17, 19, 20, 21, 24, 25, 27, 31, 33, 35, 37, 38, 43, 44, 45, 49, 50, 56, 57, 58, 59, 63, 64, 66, 67, 69-80. [57-1].

Plaintiffs also allege that various statements describing or forecasting specific growth metrics were false and misleading. *E.g.*, [50] ¶¶ 206 ("The healthcare segment contributes 7 percentage points of growth and share repurchases contribute around 3%); 242 (the VillageMD Venture was "expected to achieve positive adjusted EBITDA by fiscal year 2024). These statements offered specific, measurable metrics rather than mere vague optimism, so they cannot be described as mere puffery. But Plaintiffs do not allege any particularized facts to show that *any* of these specific statements were false or misleading at the time they were made. And to the extent that a given statement predicted some metric of success that ultimately did not come to pass, that statement is protected by the PSLRA safe harbor. 15 U.S.C. § 78u-5(i)(1)(A); *see also In re Overstock Sec. Litig.*, No. 2:19-CV-709-DAK-DAO, 2021 WL 4267920, at *7 (D. Utah Sept. 20, 2021), *aff'd*, 119 F.4th 787 (10th Cir. 2024) (statement projecting financial results is "the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor."). Because Plaintiffs fail to allege that the statements were made "with actual knowledge" that they were false or misleading, those statements[10] are inactionable. 15 U.S.C.A. § 78u-5(c)(1)(B)(i).

### iv. Statements Regarding Medicaid

Plaintiffs also allege that Defendants Brewer and Kehoe made false and misleading statements regarding VillageMD accepting Medicaid. Specifically, on October 14, 2021, Brewer said that VillageMD was "focused on all patient populations: Medicare, Medicare Advantage, Medicaid, commercial and the

---

[10] *See* Statements 3, 4, 5, 6, 22, 51, 52, 53, 54, 55. [57-1].

uninsured," and Kehoe said VillageMD "accept[s] all types of insurance." [50] ¶ 208. Brewer explained that this was "very important." *Id*. But CW 1, who served as a national medical director and executive vice president of VillageMD, reported that VillageMD "did not accept Medicaid. Period." [50] ¶ 151.

Defendants argue that these statements were not false or misleading because in *other* statements, Walgreens told investors that VillageMD accepted Medicaid only "in participating markets." [57] at 20. As such, Walgreens argues, "no reasonable investor would think that *every* VillageMD accepted Medicaid for *every* patient." [73] at 13. That may be true, but a reasonable investor would certainly understand from Brewer's and Kehoe's statements that at least *some* VillageMD clinics accepted Medicaid. And VillageMD's national medical director reported the opposite. Taking the facts in the complaint as true, Plaintiffs have adequately alleged that Defendants Brewer's and Kehoe's statements[11] about Medicaid were materially false or misleading.

### v. Statement Regarding Labor Issues

Finally, Plaintiffs allege that Brewer made a false and misleading statement[12] about labor issues in response to an analyst question on October 13, 2022 about "labor headwinds [Walgreens was] seeing across [U.S. Healthcare}." [50] ¶ 240. Brewer replied: "So labor trends in [the U.S. Healthcare] side, we -- there's really no impact there. That's our primary care physician position through VillageMD. We're

---

[11] Statements 7 and 8. [57-1].
[12] Statement 48. [57-1].

continuing to grow the number of primary care physicians. So we're really not seeing a labor issue on our [U.S. Healthcare] side." [50] ¶ 240.

Taking the facts in the complaint as true, Plaintiffs have adequately alleged that Brewer's statement was materially misleading. CW 3 reported that more than 50% of clinics had staffing shortages and that there were significant staffing shortages at clinics across the country. [50] ¶ 102. CW 6 similarly reported that even before the start of the Class Period, VillageMD was struggling to staff clinics. [50] ¶ 104. Another CW reported opening several clinics that went unstaffed in 2021. [50] ¶ 105. Yet another CW reported working on opening 40 clinics between March 2020 and September 2022 that Walgreens was "never able to staff." [50] ¶ 100. Brewer's representation in October 2022 that Walgreens was "not really seeing a labor issue" is materially misleading in light of the facts alleged in the complaint.

### C. Scienter

In addition to alleging that a statement was false or misleading, to state a claim Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. *Cornielsen*, 916 F.3d at 601. Scienter refers to "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Id.* (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). The Seventh Circuit has rejected the "group pleading doctrine" and instead requires that plaintiffs "create a strong inference of scienter with respect to *each individual defendant*." *Id.* (citing Pugh, 521 F.3d at 693–94) (emphasis added in *Cornielsen*).

"While a court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue." *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009)

For the reasons discussed above, the Court has found that Plaintiffs have plausibly alleged the following statements were, at the pleadings stage, materially false or misleading:

| Statement No. | Speaker | Date | Statement |
|---|---|---|---|
| 7 | Brewer | October 15, 2021 | "One thing that is very important about VillageMD and a primary reason we started this partnership to begin with is that they are focused on all patient populations: Medicare, Medicare Advantage, Medicaid, commercial and the uninsured. This was a really important aspect for us since it allows us to serve patients across their life journeys." [50] ¶ 208. |
| 8 | Kehoe | October 15, 2021 | "[VillageMD] accepts all types of insurance." [50] ¶ 208. |
| 47 | Kehoe | October 13, 2022 | ". . . So instead of 160 clinics in calendar '22, we've gone to 200. So we're actually doing the smart thing. We're doubling down." [50] ¶ 237 |
| 48 | Brewer | October 13, 2022 | "So labor trends in [the U.S. Healthcare] side, we—there's really no impact there. That's our primary care physician position through VillageMD. We're continuing to grow the number of primary care physicians. So we're really not seeing a labor issue on our Walgreens Health side." [50] ¶ 240. |
| 68 | Driscoll | September 21, 2023 | "Yes, I think we should be [on track to have 600 co-located clinics by 2025 and 1,000 by 2027."] [50] ¶ 260. |

The question, then, is whether Plaintiffs have alleged facts sufficient to support a strong inference the speakers of any of the above statements acted with an intent to deceive.

With respect to the first two statements regarding insurance coverage, the answer is no. Plaintiffs allege no facts supporting an inference that either Brewer or Kehoe suggested that VillageMD accepted Medicaid with an intent to deceive. Plaintiffs' briefing on scienter failed to mention either statement or even suggest facts that might support an inference of scienter with respect to either statement. *See* [68] at 23-30. The Court is at a loss to discern what Defendants could gain by misleading the market in this way.

With respect to the remaining statements, however, the Court finds that Plaintiffs' allegations support a strong inference of scienter. Taking the facts in the complaint as true it is difficult to believe that they could *not* know that each statement was false or misleading. The complaint alleges that Walgreens pinned its success on what the company hoped would be a "transformational" pivot to healthcare, and the VillageMD Venture was the "key" for Walgreens to "unlock . . . long-term growth." [50] ¶ 2, 65, 73. The complaint further alleges that Kehoe, Driscoll, and other Walgreens executives met at monthly and quarterly meetings with VillageMD executives where they discussed the clinic rollouts "in great detail." [50] ¶ 152. Further, and as discussed above, beginning in January 2023, Walgreens' quarterly SEC filings stated that the number of clinics were "key performance indicators" for Walgreens and that Walgreens' "management has evaluated its results of operations using these metrics and believes that these key performance indicators presented provide additional perspective and insights when analyzing the

core operating performance of the Company from period to period and trends in its historical operating results." [50] ¶ 236 n.28.

Defendants have not offered a competing inference explaining why Kehoe and Driscoll would have represented what was apparently false information about the clinic openings after a nationwide hold went into effect, or an explanation as to why Brewer would claim that they had no labor issues when labor issues had allegedly plagued the VillageMD Venture from its inception. Discovery may reveal that such an inference exists (or it may reveal that the statements were in fact neither false or misleading). But at the pleadings stage, Plaintiffs have met their burden. Accordingly, Plaintiffs have adequately pled scienter and stated a claim under Section 10(b) and Rule 10b-5 with respect to statements 47, 48, and 68. Plaintiffs have failed to state a claim with respect to the remaining 77 alleged statements.

### D. Section 20(a) Claim

Plaintiffs also bring a Section 20(a) claim against each individual Defendant. As both parties agree, Plaintiffs' Section 20(a) claim can only survive dismissal to the extent their underlying Section 10(b) claim survives. *See, e.g., Walleye Trading LLC v. AbbVie, Inc.*, 2019 WL 4464392, at \*5 (N.D. Ill. Sept. 18, 2019), *aff'd*, 962 F.3d 975 (7th Cir. 2020) (dismissing Section 20(a) claim because plaintiff failed to plead a primary violation). Accordingly, Plaintiffs' Section 20(a) claim is dismissed with respect to all statements other than statement 47, 48, and 68.

### E. Leave to Amend

Plaintiffs have leave to file an amended complaint. However, any amended complaint should be consistent with this order, the requirements of the PSLRA, and

34

Plaintiffs' counsels' Rule 11 obligations. Plaintiffs are cautioned to not waste judicial resources by alleging, for example, that straightforward factual statements are actionable under the PSLRA absent a coherent argument as to why they are misleading. *See, e.g.*, [50] ¶¶ 202-03 (alleging that it was "false and misleading" for Defendants to issue a press release titled "Walgreens Boots Alliance Makes $5.2 Billion Investment in VillageMD to Deliver Value-Based Primary Care to Communities Across America" without alleging that the statement was false or that Walgreens was in possession of any information at that time that would make the statement misleading).

## IV.    Conclusion

Defendants' motion to strike [71] is denied and Defendants' motion to dismiss [57] is granted in part and denied in part. The motion to dismiss is denied only with respect to statements 47, 48, and 68; it is granted with respect to the remaining statements. Defendants Wentworth and Mahajan are dismissed from the case without prejudice.

E N T E R:

Dated: January 5, 2026

_____
MARY M. ROWLAND
United States District Judge